**Robert S. WEIL and Jean K. Weil, Plaintiffs,**

v.

**Mark MURRAY, Ian Peck and John or Jane Doe, Defendants.**

No. 98 Civ. 7163(MBM).

United States District Court, S.D. New York.

April 9, 2001.

252

Jeffrey L. Braun, Lauren Reiter Brody, Rosenman & Colin, New York City, for Defendant Ian Peck.

Frederick T. Davis, Jeremy G. Epstein, John J. Master III, Shearman & Sterling, New York City, for Defendant Mark Murray.

## OPINION & ORDER

MUKASEY, District Judge.

Plaintiffs Robert S. Weil and Jean K. Weil sue Mark Murray, Ian Peck, and John or Jane Doe for breach of contract, specific performance, and injury to property, arising from defendants' alleged agreement to buy a painting by Edgar Degas. Plaintiffs also sue Murray for breach of warranty. Plaintiffs allege subject matter jurisdiction pursuant to 28 U.S.C. § 1332, diversity of citizenship.[1] Plaintiffs move for summary judgment pursuant to Fed. R.Civ.P. 56 against Murray on their breach of contract, specific performance, and breach of warranty claims. Peck moves for summary judgment against plaintiffs as to all the claims brought against him. For the reasons stated below, plaintiffs' motion for summary judgment as to their action for the price is granted. Peck's motion is denied.

## I.

The following facts are undisputed except as described otherwise. Mark Murray and Ian Peck are art dealers who own

Peter R. Stern, Kenneth J. Applebaum, Berger Stern & Webb, New York City, for Plaintiffs.

---

1. Although defendants do not raise the point, plaintiffs plead only their residence in Alabama and defendants' residence in New York. (Comp.¶¶ 2, 3, 5) 28 U.S.C. § 1332 requires diversity of citizenship, not merely residence. *See Canedy v. Liberty Mut. Ins.,* 126 F.3d 100, 103 (2d Cir.1997). This decision on plaintiffs' motion for summary judgment against Murray, and Peck's motion for summary judgment against plaintiffs, is contingent on plaintiffs' amendment of the allegation of jurisdiction pursuant to 28 U.S.C. § 1653 to establish diversity of citizenship. A failure to amend will result in dismissal for lack of subject matter jurisdiction.

separate art galleries located at 980 Madison Avenue, New York, New York. (Peck 56.1 ¶¶ 4, 5; Murray 56.1 ¶¶ 1, 2, 4) Robert and Jean Weil are individuals residing in Montgomery, Alabama. (Weil 56.1 ¶ 1; Peck 56.1 ¶ 1; Murray 56.1 ¶ 3)

On October 19, 1997, Murray and Sam Lehr, a business acquaintance of his, traveled to Montgomery. At Weil's home, Murray viewed various paintings in Weil's collection, including a painting by Edgar Degas titled "Aux Courses" (the "Degas"), which Murray examined under ultraviolet light. (Weil 56.1 ¶¶ 5–7; Murray 56.1 ¶¶ 11, 12; Peck 56.1 ¶¶ 14, 15)

Murray claims to have later discussed the Degas with Peck, who, according to Murray, expressed an interest in buying it and asked Murray to arrange to have it brought to New York. (Murray Aff. ¶ 10; *but see* Murray Dep. at 53) Peck, on the other hand, asserts that he did "not specifically" discuss the Degas with Murray prior to its arrival in New York. (Peck Dep. at 64) Nonetheless, Murray telephoned Weil and told him that he had spoken with someone who might be interested in purchasing the Degas. (Weil 56.1 ¶ 9; Murray Dep. at 55) On November 3, 1997, the director of Murray's gallery, Stephanie Calman, traveled to Weil's home in Alabama. (Weil 56.1 ¶ 10; Murray 56.1 ¶ 19; Peck 56.1 ¶ 18) Calman, on behalf of Murray, and Weil executed an agreement which provided for consignment of the Degas to Murray's gallery "for a private inspection in New York for a period of a week" from November 3, "to be extended only with the express permission of the consignor." (Weil 56.1 ¶¶ 12, 13; Murray 56.1 ¶¶ 19, 20; Peck 56.1 ¶¶ 18, 19) Calman returned to New York with the painting the same day. (Weil 56.1 ¶ 15; Murray 56.1 ¶ 20; Peck 56.1 ¶ 23)

Murray then showed the Degas to Peck. (Murray 56.1 ¶ 21; Peck 56.1 ¶ 24) Peck acknowledges only that he expressed an interest in purchasing the Degas after seeing it, and that the price of $1,225,000 was discussed. (Peck Dep. at 77, 79; *see also id.* at 150–51) Murray asserts that on or before November 8, 1997, he agreed with Peck that Peck would purchase the painting for $1,225,000 with Murray "acting as a broker." (Murray Aff. ¶ 12)

On or about November 8, 1997, Murray called Weil to inform him that he had a buyer for the Degas, and the two orally agreed to the sale. (Murray 56.1 ¶¶ 26, 27; Weil Dep. at 109–10) The agreement subsequently was confirmed in writing. (Murray 56.1 ¶ 46; Weil Dep. at 118–119) Peck's attorney wrote the first draft. (Murray Dep. at 77; Peck Dep. at 18, 90; Stern Aff. in Opp., Ex. N) Murray retyped that draft, changing the references to the buyer from Peck to Murray, and changing the purchase price from $1,125,000 to $1 million. (Brody Aff., Ex. 11; Stern Aff. in Opp., Ex. N) Murray then forwarded the draft to Weil. (Murray Dep. at 77–80) Weil responded with an alternative version. (Weil 56.1 ¶ 19; Murray 56.1 ¶ 52) Murray retyped Weil's version on Mark Murray Fine Paintings letterhead. (Weil 56.1 ¶ 20; Murray 56.1 ¶ 58) Murray contends that he showed Peck "a version" of the agreement, drafted by Weil and retyped by Murray, and that Peck "authorized" him to sign it.[2] (Murray Aff. ¶¶ 31, 32; Murray Dep. at 141) Peck, on the other hand, claims that there was "no discussion" of the version of the agreement Murray showed him, and that Murray merely brought it to him so he would know how much to pay. (Peck Dep. at 98–99; *see also* Peck 56.1 ¶¶ 42, 43) On November 26, 1997, Murray signed

---

**2.** Murray altered the price on the version he showed to Peck in order "to maintain the confidentiality" of a payment he intended to make to Sam Lehr. (Murray Aff. ¶ 31)

the agreement drafted by Weil and re-typed on Murray's letterhead. (Weil 56.1 ¶¶ 19, 20; Murray 56.1 ¶ 63) Weil signed the agreement on December 1, 1997. (Weil 56.1 ¶ 21; Murray 56.1 ¶ 64)

The signed agreement defines the "buyer" as Mark Murray; the "sellers" are defined as Jean K. Weil and Robert S. Weil, Partners Weil Brothers. (Stern Decl., Ex. N) The written agreement states:

> In confirmation of our oral agreement, Sellers agree to sell and Buyer agrees to buy that certain oil on panel painting by Edgar Degas, known as Aux Courses, ... for the sum of One Million Dollars ($1,000,000), net to Sellers, said sale to have taken effect and hereby confirmed by this contract duly signed by Buyer and Sellers. It is understood that the eventual Buyer is an Undisclosed Principal client of Mark Murray, and that said undisclosed principal shall also be bound by this agreement.

(Stern Decl., Ex. N) After reciting payment procedures and warranties of title and authenticity, the agreement concludes as follows:

> It is expressly understood between Buyer and Sellers that the ultimate buyer is an Undisclosed Principal unknown to the Seller. Consequently, Buyer warrants that said Undisclosed Principal guarantees this purchase and performance in every respect. Should Sellers not receive full payment by December 8th, Buyer agrees to divulge to the Sellers the exact identity of the Undisclosed

Principal, and the Undisclosed Principal must hereby guarantee this purchase and stand in the shoes of the Buyer, should there be cause for non-performance in any particular by said Ultimate Buyer.

(Stern Decl., Ex. N) Neither Murray nor anyone else ever paid Weil the $1 million. (Weil 56.1 ¶ 30) Nonetheless, Murray maintained possession of the Degas from November 3, 1997 through March 25, 1998, when Weil requested its return. (Murray 56.1 ¶¶ 77, 79; Murray Aff. ¶ 43)

At some point before its return to Weil, the Degas was sent to Juan Perdiguero, an art conservator. Although Murray claims the painting was sent at Peck's request (Murray Aff. ¶ 21), Peck asserts that he and Murray "collectively" went to Perdiguero. (Peck Dep. at 14) A "condition report" prepared by Perdiguero and dated December 3, 1997, showed that Perdiguero sought to correct the alleged deterioration of the painting. (Stern Decl., Ex. Q) Peck paid for Perdiguero's work. (Peck Dep. at 14; Murray Dep. at 179) Weil first become aware of this work in March 1998. (Weil 56.1 ¶ 43)

## II.

■ Plaintiffs seek summary judgment on, *inter alia,* their action for the price—called specific performance in the complaint.[3] To recover on an action for the price pursuant to Section 2–709(1)(a) of the New York Uniform Commercial Code,[4] plaintiffs must show that 1) they had a contract; 2) the buyer failed to pay the

---

**3.** The parties' briefs assume that New York law controls, and such "implied consent ... is sufficient to establish choice of law." *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989); *see also 3Com Corp. v. Banco do Brasil, S.A.,* 171 F.3d 739, 743 (2d Cir. 1999). Furthermore, the transaction at issue

bears "an appropriate relation to" New York. N.Y. U.C.C. § 1–105 (McKinney 1993 & Supp. 2000).

**4.** Article 2 of the New York Uniform Commercial Code, governing the sale of goods, applies in this case. *See Rosenfeld v. Basquiat,* 78 F.3d 84, 93 (2d Cir.1996).

purchase price; and 3) the buyer accepted the goods. *See Hyosung America, Inc. v. Sumagh Textile Co.*, 137 F.3d 75, 79 n. 1 (2d Cir.1998) (listing the elements of a claim pursuant to N.Y. U.C.C. § 2–709(1)(b)). Although plaintiffs and Murray do not dispute the existence of an agreement, they do dispute the extent of Murray's obligations pursuant to it.

■■■ Murray argues that summary judgment is inappropriate here because the written agreement is "ambiguous and hopelessly self-contradictory." (Murray Brief in Opp. at 15) I disagree. The contract clearly defines Murray as the "Buyer." The contract further provides that "the Sellers agree to sell and Buyer agrees to buy that certain oil on panel painting by Edgar Degas, known as Aux Courses, ... for the sum of One Million Dollars...." (Stern Decl., Ex. N) A motion for summary judgment in a contract dispute may be granted "where the agreement's language is unambiguous and conveys a definite meaning." *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993). Whether a writing is ambiguous is a question of law for the trial court. *Id.* (citing *W.W.W. Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990)).

As evidence of ambiguity, Murray cites the following language from the contract: "It is understood that the eventual Buyer is an Undisclosed Principal client of Mark Murray, ..." (Stern Decl., Ex. N) Murray points to additional references to the undisclosed principal, referred to also as the "eventual buyer" and the "ultimate buyer," and the statement that, "[s]hould Sellers not receive full payment by December 8th, Buyer agrees to divulge to the Sellers the exact identity of the Undisclosed Principal." (Murray Brief in Opp. at 16) Based on this language, Murray advocates a reading of the contract that would make

him neither the buyer, nor an agent for the partially disclosed principal, but rather an intermediary whose only contractual obligation was to reveal the identity of the undisclosed principal.

■■■ "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992). To interpret the contract as Murray suggests would render meaningless the language that "the Sellers agree to sell and Buyer [defined as Mark Murray] agrees to buy that certain oil on panel painting by Edgar Degas, known as Aux Courses, ... for the sum of One Million Dollars...." *See Larimi Communications Assocs., Ltd. v. Billboard Publications, Inc.*, 1992 WL 82005, at *3 (S.D.N.Y.1992) ("[C]ourts should avoid construing contracts in such a way as to leave contractual clauses meaningless."); *see also Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assoc.*, 63 N.Y.2d 396, 404, 482 N.Y.S.2d 465, 468, 472 N.E.2d 315 (1984). The contract's reference to an undisclosed principal who "shall *also* be bound by [the] agreement" (emphasis added) does not extinguish Murray's obligation as the buyer. Even assuming that Murray was merely signing the contract as an agent for the so-called "undisclosed principal," an agent who enters into an agreement on behalf of a partially disclosed principal is obligated to perform the contract. *Orient Mid–East Lines v. Albert E. Bowen, Inc.*, 458 F.2d 572, 576 (2d Cir.1972) (citing Restatement of Agency (Second) § 321 (1958)); *see also Venezio v. Bianchi*, 124 A.D.2d 933, 934, 508 N.Y.S.2d 349, 351 (3d Dep't 1986). The written contract, though not artful, is unambiguous. Mark Murray agreed to buy the Degas for $1 million. To construe the contract to mean that Murray was only an intermediary, not the buyer or even an

agent of the buyer (Murray Dep. at 92–93), is to "strain the contract language beyond its reasonable and ordinary meaning." *Seiden Assoc.*, 959 F.2d at 428 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459, 161 N.Y.S.2d 90, 93, 141 N.E.2d 590 (1957)).

■ Plaintiffs have established also the remaining elements of their action for the price pursuant to Section 2–709(1)(a) of the New York Uniform Commercial Code. Section 2–709(1)(a) provides that "[w]hen the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price of goods accepted...." N.Y. U.C.C. § 2–709(1)(a) (McKinney 1993). A buyer is defined by the U.C.C. as "a person who buys or contracts to buy goods." N.Y. U.C.C. § 2–103(1)(a) (McKinney 1993). As discussed above, Murray contracted to buy the Degas, and is therefore a "buyer" as defined by the U.C.C. It is undisputed that Murray failed to pay the price when it became due. (Weil 56.1 ¶ 30)

■ The undisputed facts establish also that Murray accepted the Degas. "Goods that a buyer has in its possession necessarily are accepted or rejected by the time a reasonable opportunity for inspecting them passes." *Seabury Constr. v. Jeffrey Chain Corp.*, 2000 WL 1170109, at *2 (S.D.N.Y.2000) (citing N.Y. U.C.C. § 2–606(1) (McKinney 1993)). As noted above, Murray first inspected the Degas under an ultraviolet light when he viewed it at the Weils' home in late October. (Weil 56.1 ¶ 5; Murray 56.1 ¶ 12) Murray had the opportunity to further examine the Degas at his gallery in New York pursuant to the consignment agreement and his continued possession of the painting following the expiration of the consignment agreement. (Weil 56.1 ¶ 15; Murray 56.1 ¶¶ 20, 77, 79) It is also undisputed that Murray was present when Simon Parkes assessed the condition of the painting sometime between November 3 and November 19, 1997. (Murray Dep. at 82–84; Peck Dep. at 71–73) Not only did Murray have a reasonable time to inspect the goods, but also it is undisputed that he actually did inspect the Degas. There is no evidence that Murray found the painting unsatisfactory or non-conforming. *See Integrated Circuits Unltd. v. E.F. Johnson Co.*, 875 F.2d 1040, 1042 (2d Cir.1989) (discussing acceptance as the failure to make an effective rejection after a reasonable time to inspect). Although the question of whether the buyer has had a reasonable time to inspect is generally a question for the trier of fact, *Sherkate–Sahami Khass Rapol v. Henry R. Jahn & Son, Inc.*, 701 F.2d 1049, 1051 (2d Cir.1983), no reasonable jury could find that Murray did not accept the Degas in light of the undisputed facts that he inspected the Degas on at least two occasions, signed the written agreement, and continued to retain possession of the Degas. *See Sessa v. Riegle*, 427 F.Supp. 760, 767 (D.C.Pa.1977) (finding acceptance when buyer was permitted unlimited inspection of a horse and then indicated that he would buy the horse), *aff'd* 568 F.2d 770 (3d Cir.1978).

Moreover, it is undisputed that, without Weil's consent, Murray, at a minimum, permitted the painting to be cleaned and restored in late November or early December. (Stern Decl., Ex. Q; Murray Aff. ¶ 21) Murray's participation in the alteration of the painting, regardless of whether such alteration increased its value, was an act inconsistent with plaintiffs' ownership. *See* N.Y. U.C.C. § 2–606(1)(c) (McKinney 1993) (defining acceptance); *see also In re Fran Char Press, Inc.*, 55 B.R. 55, 57 (Bankr.E.D.N.Y.1985) (finding that buyer had accepted posters by taking possession of them and mounting them on cardboard),

cited with approval in *Sobiech v. International Staple & Machine Co.*, 867 F.2d 778, 781 (2d Cir.1989); *see also Industria De Calcados Martini Ltd. v. Maxwell Shoe Co.*, 36 Mass.App.Ct. 268, 630 N.E.2d 299 (1994) (finding acceptance where buyer had shoes refinished). Plaintiffs have established that Murray agreed to purchase the Degas, accepted it, and nonetheless failed to pay the purchase price.

■ The return of the painting to Weil and his current possession of the Degas do not preclude a finding that plaintiffs are entitled to the contract price. *See White & Summers*, 1 *Uniform Commercial Code* 364 (4th ed. 1995) ("[B]uyer's return of accepted goods does not deprive seller of its 2–709 right to the price."). Section 2–709(2) of the New York Uniform Commercial Code provides for a seller's retention of goods. The statute requires only that "the net proceeds of any … resale must be credited to the buyer and payment of the judgment entitles [the buyer] to any goods not resold." N.Y. U.C.C. § 2–709(2) (McKinney 1993).

■ Plaintiffs are entitled to the contract price of $1 million and any incidental damages. N.Y. U.C.C. § 2–709(1)(a) (McKinney 1993). Incidental damages include prejudgment interest, which, in a diversity case, is controlled by the rule of the jurisdiction whose law controls liability. *See Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 131 (2d Cir.1984); *see also Hyosung America, Inc. v. Sumagh Textile Co., Ltd.*, 137 F.3d 75, 81 (2d Cir.1998); *Sobiech*, 867 F.2d at 781. Section 5001 of the N.Y. C.P.L.R. requires that prejudgment interest be computed from the earliest ascertainable date that the cause of action existed, in this case,

December 8, 1997—the date payment was due but not received. N.Y. C.P.L.R. § 5001 (McKinney 1992 & Supp.2000). The rate of interest under New York law is nine percent simple interest per annum. N.Y. C.P.L.R. § 5004 (McKinney 1992). Plaintiffs are entitled to a judgment of $1,298,849.31.[5] Upon payment of the judgment, Murray is entitled to the Degas.

### III.

Plaintiffs move also for summary judgment against Murray for breach of contract and breach of warranty. Because plaintiffs are entitled to summary judgment against Murray for the contract price on their claim pursuant to Section 2–709 of the New York Uniform Commercial Code, it is unnecessary to decide plaintiffs' remaining claims against Murray.

### IV.

■ Peck moves for summary judgment against plaintiffs on all claims brought against him. It is undisputed that Peck did not sign the written agreement for the sale of the Degas, and had no direct dealings with plaintiffs prior to December 9, 1997. Therefore, Peck argues, because he was not a party to the contract, he cannot be held liable for plaintiffs' breach of contract claim and action for the price. However, summary judgment is inappropriate because a genuine issue of material fact exists as to whether Murray was acting as Peck's agent when he signed the contract to buy the Degas.

■ Parties may establish an agency relationship through "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires

**5.** The prejudgment interest was calculated as follows: ($1,000,000.00) × (.09) × (3.3205479).

him so to act on the principal's account." *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 702 (2d Cir.1990) (quoting Restatement (Second) of Agency § 26 (1958)). If an agency relationship is established, the principal is responsible for the agent's acts within the scope of the his real or apparent authority. *Citibank, N.A. v. Nyland (CF8) Ltd.,* 878 F.2d 620, 624 (2d Cir.1989). Although Peck spends a significant portion of his argument discussing Weil's perception of the relationship between Murray and Peck, the question of "whether express agency is formed depends on the actual interaction between the putative principal and agent, not any perception a third party may have of the relationship." *Itel Containers,* 909 F.2d at 702.

Although Peck claims that he did "not specifically" discuss the Degas prior to its arrival in New York (Peck Dep. at 64), Murray asserts that Peck asked him to arrange to have it brought to New York. (Murray Aff. ¶ 10) And, although Peck claims only to have "expressed an interest" in the painting after seeing it (Peck Dep. at 77, 79, 150–51), Murray asserts that on or before November 8, 1997, he agreed with Peck that Peck would purchase the painting with Murray "acting as a broker." (Murray Aff. ¶ 12) Furthermore, Peck's attorney wrote the first draft of the written agreement. (Murray Dep. at 77; Stern Aff. in Opp., Ex. N) Murray contends that he showed Peck a version of the final written agreement, and that Peck "authorized" him to sign it.[6] (Murray Aff. ¶¶ 31, 32) Finally, although Peck asserts that he went "collectively" with Murray to

Perdiguero to have the painting cleaned and restored (Peck Dep. at 14), Murray claims that the painting was sent at Peck's request. (Murray Aff. ¶ 21) It is undisputed that Peck paid Perdiguero for his work on the Degas. (Peck Dep. at 14; Murray Dep. at 179) Looking at the facts in the light most favorable to non-moving plaintiffs, a reasonable jury could conclude that Peck's conduct, reasonably interpreted, caused Murray to believe that Peck wanted him to buy the painting on Peck's behalf, and therefore that Murray was acting as an agent for Peck when he agreed to buy the Degas.

Peck argues also that he is entitled to summary judgment because the written agreement is explicitly a bilateral agreement between Murray and plaintiffs, and therefore, Peck cannot be bound by it. However, the contract states that the "undisclosed principal shall *also* be bound by this agreement." (emphasis added) Murray asserts that Peck was the undisclosed principal referred to in the agreement. If the jury were to determine that Murray was acting as Peck's agent, with authority to sign the contract, then Peck could be bound. Furthermore, although Murray signed the contract in his name, not as the agent for Peck or the undisclosed principal, a "partially disclosed principal is subject to liability upon an authorized contract in writing ... although it purports to be the contract of the agent unless the principal is excluded as a party by the terms of the instrument or by the agreement of the parties." Restatement (Second) of Agency § 149 (1958). Finally, it bears mention that the written agreement, if signed by

---

**6.** Peck makes much of the fact that the purchase price on the version of the agreement Murray allegedly showed him was different from the purchase price on the agreement signed by Murray and Weil. Murray's presentation of an altered contract may be a fact relevant to the jury's determination of wheth-

er Murray was acting as Peck's authorized agent, but it does not entitle Peck to summary judgment against plaintiffs. *Cf. Ricketts v. Pennsylvania R.R. Co.,* 153 F.2d 757, 759 (2d Cir.1946) (finding that principal was bound by acts of agent despite agent's deception of the principal).

Murray as Peck's authorized agent, satisfies the Statute of Frauds. *See* N.Y. U.C.C. § 2–201 (McKinney 1993 & Supp. 2000).

■ Peck's potential liability for the contract is not inconsistent with the summary judgment against Murray granted above. An agent who enters into an agreement on behalf of an undisclosed or partially disclosed principal is jointly and severally liable with the principal. *Cf. St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.,* 687 F.Supp. 820, 832 (S.D.N.Y. 1988) (addressing undisclosed principal), *aff'd* 895 F.2d 1410 (2d Cir.1989); *see also Orient Mid–East Lines v. Albert E. Bowen, Inc.,* 458 F.2d 572, 576 (2d Cir.1972) (citing Restatement of Agency (Second) § 321 (1958)). Genuine issues of material fact exist as to whether Murray was acting as Peck's authorized agent when he signed the written agreement. Therefore, Peck is not entitled to summary judgment against plaintiffs dismissing their breach of contract claim and action for the price.

### V.

Plaintiffs concede that if they are awarded the contract price, they will be made whole, and therefore will not seek recovery on their damages claims. (Mem. in Opp. at 21, n. 10) Because plaintiffs are entitled to summary judgment, albeit against Murray, for the contract price, I need not decide Peck's motion for summary judgment on plaintiffs' injury to property claim.

\* \* \* \* \* \*

For the reasons stated above, plaintiffs' motion for summary judgment against Murray is granted on their action for the price. Peck's motion for summary judgment against plaintiffs is denied as to plaintiffs' breach of contract and action for the price claims.

SO ORDERED.