HIDDEN BROOK AIR, INC., Plaintiff,

v.

THABET AVIATION INTERNATION-
AL INC., Clermont Levasseur, 161768
Canada Inc., and Raytheon Aircraft
Company Defendants.

No. 99 Civ.11865 CM GAY.

United States District Court,
S.D. New York.

Oct. 31, 2002.

Ronald S. Rolfe, Cravath, Swaine & Moore, New York City, for Plaintiff.

Gerald Benvenuto, Traub Eglin Lieberman Straus, Hawthorne, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER DENYING ALL PARTIES' MOTIONS FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

This case begins with the aborted sale of a "Beach King Air 350" twin-prop airplane, referred to by its serial number FL–165. Plaintiff Hidden Brook Air, Inc. ("Hidden Brook") alleges that defendants Clermont Levasseur and his closely-held corporation, 161768 Canada, Inc. (collectively "Levasseur Defendants") breached a contract to buy FL–165, and that defendant Raytheon Aircraft Corporation ("Raytheon") tortiously induced that breach of contract. The Levasseur Defendants, in turn, counterclaim that it was Hidden Brook, not they, that breached the contract. Hidden Brook moves for summary judgment on all claims, and Raytheon moves for summary judgment on Hidden Brook's tortious interference with contractual relations claim.

For the reasons stated below, I must deny all parties' motions. Some issues are amenable to summary judgment, however, which should shorten the trial. I also take this opportunity to make several rulings of law that need not await trial.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted.

### A. *The Parties*

Hidden Brook is a corporation that owns and maintains an aircraft for Marshall Field, IV ("Field"). Field is the corporation's President and sole shareholder. Hidden Brook owned and maintained a twin-prop airplane, known by its serial number FL–165, which it had purchased in 1997 from the airplane's manufacturer, Raytheon. In late 1998, Hidden Brook decided to sell FL–165 and acquire a jet to replace it. The corporation hired Robert Abrams ("Abrams"), an individual with experience in the sale and marketing of aircrafts, to help it complete the sale. Abrams advertised the aircraft in several publications and on the Internet.

Defendants Clermont Levasseur and 161768 Canada, Inc. ("Levasseur Defendants") own and maintain various aircrafts. In early 1999, they wanted to purchase a Beech King Air 350. Toward that end, they opened discussions with that model aircraft's manufacturer, Raytheon. More specifically, they began negotiations with William J. Spencer ("Spencer"), a Raytheon sales director, for the purchase of a "New Ultra Quiet Super King Air 350" known by the identification number FL–259. On or around June 7, 1999, Raytheon offered to sell FL–259 for $5 million. The Levasseur Defendants did not accept the offer.

Raymond Thabet ("Thabet") is the President and sole shareholder of the Canadian corporation Thabet Aviation International,

Inc. His corporation locates planes for buyers, prepares the necessary documentation, and if necessary arranges for the importation of the purchased plane into Canada from the United States. Thabet performed such services for the Levasseur Defendants several times prior to the events at the center of this case. In April of 1999, for example, Thabet located an aircraft in Minnesota, arranged for the pre-purchase inspection, opened an escrow account, negotiated with the seller, registered the aircraft in Canada, and purchased the aircraft in his own name on behalf of 161768 Canada, Inc. Thabet was not involved in the Levasseur Defendants' negotiations with Spencer concerning the purchase of FL–259.

### B. The Offer to Purchase FL–165

In late May 1999, Thabet learned through one of Abrams's advertisements that FL–165 was for sale. He contacted the Levassuer Defendants and told them that he had found a plane they might be interested in purchasing. The Levassuer Defendants told Thabet to gather more information, so he contacted Abrams. Thabet was to receive a $50,000 commission from the Levasseur Defendants if he introduced them to a plane that they ultimately purchased.

After contacting Abrams, Thabet advised "M. Levasseur," by fax dated June 1, that Hidden Brook's asking price was $4.2 million. What was attached to the fax is in dispute. Hidden Brook (based solely on Thabet's testimony) claims that Thabet sent two draft offers to the Levasseur Defendants for them to review, one at a price of $3.95 million and one at $4 million. The Levasseur Defendants contend that they received only the draft offer for $3.95 million.

Except for the price, the two draft offers were not materially different. In particular, both draft offers stated: "WE HEREBY OFFER TO PURCHASE THE AIRCRAFT DESCRIBED BELOW ON BEHALF OF OUR CUSTOMER CLERMONT LEVASSEUR," and included several terms and conditions. They provided, for example, that (1) $200,000 was to be put in escrow upon acceptance of the offer, (2) Hidden Brook was to correct any major deficiency found during an inspection of FL–165, (3) title was to be free and clear of all liens and encumbrances at closing, (4) all original aircraft records were to be handed over with the plane, and (5) the plane was to be delivered with all systems and avionics in good working condition. In addition, the offers stated that "IF THE AIRCRAFT SUCCESSFULLY PASSES THE PREPURCHASE INSPECTION, WILL PURCHASE THE AIRCRAFT."

Hidden Brook claims, again based on Thabet's deposition testimony, that the Levasseur Defendants authorized Thabet to send Hidden Brook the higher offer, for $4 million. Levasseur testified that he authorized Thabet to offer $3.95 million, which was the only offer he knew about. There is no dispute that Levasseur authorized *some* offer to be sent, or that Thabet sent Hidden Brook the $4 million offer, signed by him and dated June 1. Field ultimately countersigned the offer. He testified the signature on the document was his, although he did not recall signing it.

### C. The Trip to Poughkeepsie and its Aftermath

On June 6, Clermont Levasseur, his wife Therese Levasseur (161768 Canada's Secretary and Treasurer), his son Thomas Levasseur (161768 Canada's Vice–President and pilot), and Thabet flew to Poughkeepsie, New York to take a look at FL–165. Field and Abrams were present representing Hidden Brook. The Levasseur

Defendants spoke with Field about some of the plane's features and inspected its exterior and interior. Everyone agreed it was in excellent condition. Clermont Levasseur told Abrams he should speak with Thabet to "move the plane." This was the only actual contact between the Levasseur Defendants and Hidden Brook.

The next day, June 7, Thabet sent a fax to "M.C. Levasseur." The fax's cover sheet explained that Thabet had opened a trust account with an escrow agent and that he was preparing a formal purchase contract "similar to what I signed June 1" (i.e. the offer to purchase FL–165) but with four additional terms: (1) delivery of the aircraft to Quebec, (2) the "[t]ransfer of guarantees," (3) inclusion of a "gravel kit" with the plane, and (4) the condition that final payment be made six days "after receiving 'export license' document." [Hidden Brook Decl. Ex. 16]

Thabet's fax also contained a copy of a document he had sent to Aero Space Reports, the escrow agent, as well as a copy of the fully executed offer for $4 million, signed by both Thabet and Field. The document sent to the escrow agent also contained the $4 million figure, stating "[t]he price for the aircraft is $4,000,000.00 US." [Hidden Brook Decl. Ex. 16] In addition, it stated, "We are making a deposit of $200,000 to hold the aircraft for the pre-buy inspection. that will be done at Stevens Beechcraft in South Carolina. Will adivise [sic] you when the deposit become non refundable." [Hidden Brook Decl. Ex. 16]

Levasseur claims he first saw the $4 million figure when he received this June 7 fax. There is no evidence, however, that he protested, or attempted to retract the offer on the ground that it was not authorized. Indeed, around the time this fax was sent, Thabet, with the Levasseur Defendants' knowledge, took additional steps to culminate the purchase of Hidden Brook's airplane. To induce Hidden Brook to take the plane off the market, Thabet obtained $200,000 from 161768 Canada and wired it to the escrow agent. Thabet also sent a fax to Abrams concerning the four additional terms that he had mentioned in his June 7 fax to the Levasseur Defendants. And on or about June 7, Robert Philpott, a consultant and occasional pilot for Hidden Brook, flew the plane to South Carolina for its formal inspection by Stevens Aviation. The inspection took place on or around June 7–9.

### D. The Purchase Agreement and the Hidden Commission

On or about June 11, Thabet faxed Abrams a purchase agreement for FL–165 signed by Thabet (hereinafter "the purchase agreement"). The fax cover sheet stated: "This is the sign [sic] copy of the purchase agreement for s/n FL–165. When able send me the signed copy back." [Hidden Brook Decl. Ex. 19] The purchase agreement provided that the purchaser (Thabet Aviation International, Inc.) would pay $4 million for FL–165–an amount that Levasseur had known about since June 7. At some point, Philpott signed the purchase agreement on behalf of Hidden Brook. He testified that he did not remember precisely when he did so, but it was at some time when he was at Stevens Aviation awaiting FL–165's export certification. [Hidden Brook Decl. Ex. 2, Philpott Dep. 37]

At Thabet's request, the purchase agreement contained a term that was not in the offer to purchase. This new term obligated Hidden Brook to pay $50,000 to "the broker designated by the purchaser"–who, of course, was Thabet. Hidden Brook was indifferent as between $4 million and $3.95 million; it viewed the $50,000 as a finder's fee. Hidden Brook did not ask Thabet to do anything improper for the $50,000 and insisted that the fee

be disclosed in the contract. As a result, every draft of the contract mentioned the fee, including the draft that Hidden Brook eventually signed. When Thabet provided the Levasseur Defendants with a copy of the final purchase agreement, however, he "whited out" the provision concerning the $50,000 fee.[1] The Levasseur Defendants did not learn about the $50,000 fee until the present litigation was well advanced.

Section 4 of the purchase agreement provided that the $200,000 deposit was to become non-refundable once the "purchaser" informed Hidden Brook and the escrow agent, via fax, that the pre-purchase inspection was completed and "purchase of the AIRCRAFT is ACCEPTED." Thabet later informed the escrow agent, at least twice, that the $200,000 was non-refundable. On June 10, he sent the escrow agent a fax stating that "[t]he deposit of $200,000 that you have in escrow on the aircraft King Air 350 ... is now non refundable." [Hidden Brook Decl. Ex. 18] More explicitly, Thabet faxed Abrams on June 21 a copy of a document he had sent to the escrow agent, which stated: "We are satisfied with the inspection and all the discrepancy's [sic] have been repaired and accomplished by Stevens Aviation ordered by Hidden Brook Air Inc and we accept the pruchase [sic] of the aircraft." [Hidden Brook Decl. Ex. 33]

### E. *The Closing Approaches*

During the week or so after Thabet faxed the executed contract to Abrams, the Levassuer Defendants took several more steps toward closing the deal. In his capacity as President of 161768 Canada, Levasseur asked Thabet to reserve registration "letters" for FL–165 with Canada's Transportation Department. In addition, 161768 Canada applied for insurance and financing for the plane. The Levasseur Defendants also obtained an "Export Certificate of Airworthiness" to facilitate importation of the plane from the U.S. to Canada. Thabet faxed this document to Levasseur on June 16.

The closing was set for June 21.[2] Thabet informed Levasseur, via a June 18 fax, that $3.8 million should be transferred as the "[b]alance payable for aircraft" on June 21. The Levasseur Defendants contend that they never knew that Thabet had signed a purchase agreement for FL–165. But they do not dispute that a contract would necessarily have had to be in place before closing, and they do not dispute that Levasseur received the June 18 fax. The record does not contain any evidence that Levasseur either (a) protested that the Levasseur Defendants never agreed to buy the plane, or (b) complained that the price was $50,000 higher than they had discussed with Thabet.

### F. *Enter Raytheon*

On June 18, Raytheon's sales director William Spencer wrote a letter to Levass-

---

1. Thabet stated in his deposition that he sent a copy of the purchase agreement to Clermont Levasseur before he signed it, which would have been before June 11. Levasseur claims that he did not see the purchase agreement until June 25. There is no dispute, however, that the copy they saw–whenever they saw it–did not show the $50,000 fee to Thabet.

2. Though the parties do not directly address this issue, this date seems to have been within the explicit terms of the purchase agreement. The agreement stated that the "[f]inal sale closing and delivery of [FL–165] ... from SELLER to PURCHASER is to take place ... on or about June 21, 1999, but in any event not later than six (6) days after export certification from Stevens Aviation." [Hidden Brook Decl. Ex. 56] Since the Levasseur Defendants obtained an "Export Certificate of Airworthiness" on June 16, the closing had to occur on or before June 22.

eur congratulating him on the purchase of FL–165. The letter also stated that Raytheon could not approve a specific site as a customer support center to perform warranty work or provide special parts discounts for FL–165, because Levasseur was not buying a new aircraft from Raytheon. Clermont Levasseur contacted Spencer by phone after he received this letter. During that telephone conversation, Spencer lowered the asking price on FL–259 from $5 million to $4.8 million. Levasseur did not contact Thabet or Hidden Brook to state that Spencer's letter mystified him because he had not yet agreed to buy the plane.

On June 21, with Philpott already in South Carolina waiting to fly the plane to Quebec post-closing, Levasseur directed Thabet to seek an extension, claiming that he needed additional time to arrange for financing. There is no evidence that Levasseur protested that he had never authorized Thabet to purchase the plane; his sole interest lay in delaying the closing.

Thabet faxed Abrams, informing him that the transfer of the amount due on FL–165 could not take place before June 25. He told Abrams that Levasseur could not liquidate some mutual funds without incurring a penalty and thus had to arrange for financing. Hidden Brook consented to postpone the closing to June 25. More specifically, Hidden Brook informed Levasseur, through Thabet, that the closing had to occur by 11 a.m. on that day. [Levasseur Defendants 56.1 Statement ¶¶ 55–56]

Levasseur used the additional days to continue discussions with Spencer on a deal for a new plane. Clermont Levasseur sent a letter to Spencer on June 21, stating that he would buy FL–259 from Raytheon for $4.8 million if Spencer "engage[d][him-]self to find a firm buyer for FL–165 at $4,000,000 USD and reimburse us the

$200,000 USD deposit." [Hidden Brook Decl. Ex. 34.] Spencer said that Raytheon could not and would not find a buyer for FL–165, and in response he sent a letter offering to accept FL–165 as a trade-in for a credit of $4 million if the Levasseur Defendants purchased FL–259. The Levasseur Defendants responded with a new proposal under which they would purchase FL–259 if Raytheon "honours the Super King Air 350, FL–165 agreement, for $4,000,000 USD including, $200,000 USD reimbursement (certified cheque) to 161768 Canada Inc." And on June 22, Levasseur informed Spencer via fax that "[w]ithout reception of a firm agreement from your part and after discussion with my agent, Raymond Thabet, there will be no delay from the owner of the Super King Air 350, FL–165, to pursue any discussion. We have to purchase the plane by Friday, June 25, 1999." Thus, Levasseur admitted, in three separate communications to Spencer, that he was contractually obligated to purchase FL–165.

Spencer flew to Quebec on June 24 to meet with Clermont Levasseur. He brought with him a copy of a contract for the purchase of FL–259, and the two had dinner together alone that night. Clermont Levasseur informed Spencer that he would not purchase FL–165, Hidden Brook's plane, and he signed a contract to purchase FL–259.

### G. The Events of June 25

Spencer arrived at the office of the Levasseur Defendants' lawyer on the morning of June 25. Hidden Brook claims that Abrams received a call from Thabet telling him that the deal was off because Levasseur had decided to buy another airplane. Levasseur testified that he wanted to close by the 11 a.m. deadline, but could not because he did not receive financing until that afternoon. At 12:45 p.m., 161768

Canada, Inc. closed the deal to purchase Raytheon's plane, FL-259.[3]

After the deal with the Levasseur Defendants fell through, Hidden Brook put FL-165 back on the market. Hidden Brook sold the plane to R.J.M. Aviation three weeks later, on July 16, 1999, for $3.4 million.

## H. *Prior Proceedings*

Hidden Brook first sued Thabet on December 8, 1999. It amended its complaint on March 30, 2000 to sue the Levasseur Defendants. The Levasseur Defendants moved to dismiss the lawsuit for lack of personal jurisdiction. They argued that this Court could only exercise jurisdiction over them, if at all, by virtue of acts performed on their behalf by Thabet. The Levasseur Defendants denied that Thabet was their agent and argued that neither their personal contacts with New York nor Thabet's contacts were sufficient for the Court to exercise its jurisdiction. I denied the Levasseur Defendants' motion because the evidence that Thabet was their agent for the purposes of negotiating the sale of FL-165 was so overwhelming that no trier of fact could find otherwise. *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, No. 99 Civ. 11865 (S.D.N.Y. filed Aug. 16, 2001). I found that the Levasseur Defendants' contacts with New York, through their agent Thabet, were sufficient to satisfy New York's long-arm statute, as well as to meet constitutional due process standards. *Id.*

Hidden Brook then amended its complaint again, this time to add Raytheon as a defendant. This Second Amended Complaint contains three counts: (a) a breach of contract claim against Thabet Aviation International Inc., (b) a breach of contract claim against the Levasseur Defendants, and (c) a tortious interference with contract claim against Raytheon. Thabet has long since defaulted. The Levasseur Defendants filed a counterclaim against Hidden Brook for breach of contract.

## II. DISCUSSION

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has made such a showing, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143

---

**3.** To support their claim that they did not receive a formal financing proposal until 2 p.m. on June 25, the Levasseur Defendants refer the Court to a letter from Newcourt Finance dated June 25. The letter approves 161768 Canada for "5 MILLION CND FINANCING OF KING AIR 350 AIRCRAFT." [Hidden Brook Decl. Ex. 27] The exhibit does not contain any time stamp, and the legend on the letter indicates that it was received at 12:50 p.m. or thereabouts–more or less the time that the corporation purchased Raytheon's plane.

F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

A. *Hidden Brook's Motion for Summary Judgment on its First Cause of Action, for Breach of Contract, is Denied*

■ Under New York law,[4] "[t]he essential elements of an action for breach of contract ... are: (1) formation of a contract between the parties; (2) performance by plaintiff; (3) non-performance by defendant; and (4) resulting damages to plaintiff." *Nakano v. Jamie Sadock, Inc.*, No. 98 CIV. 0515, 2000 WL 680365, at *5 (S.D.N.Y. May 25, 2000); *see also First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir.1998); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir.1994).

Hidden Brook claims that (1) it entered into a valid contract with the Levasseur Defendants, signed by Thabet, who acted within his authority as their agent, (2) it fully complied with the terms of the contract, (3) the Levasseur Defendants failed to perform under the contract, and (4) it suffered damages as a result of the Levasseur Defendants' breach. In response, the Levasseur Defendants argue that (1) they did not enter into a valid contract with Hidden Brook because Thabet did not act as an agent within the scope of his authority, (2) in any case, the purchase agreement is void and unenforceable due to misconduct on Thabet's part, (3) it was Hidden Brook that did not perform under the terms of the purchase agreement, and

(4) Hidden Brook failed to mitigate its damages.

1. *Thabet Had Apparent Authority to Sign the Purchase Agreement*

■ It is black letter law that an agent binds his principal when he enters into a contract within the scope of his authority. *British American & Eastern Co. v. Wirth Ltd.*, 592 F.2d 75, 80 (2d Cir.1979) ("An agent serves under the control and supervision of his principal; so long as he acts within the ambit of his authority to represent his principal, he binds him."). In my previous Memorandum Decision and Order, I concluded that the evidence concerning Thabet's agency for the purpose of negotiating the FL–165 transaction was so overwhelming that no reasonable trier of fact could conclude that he was not the Levasseur Defendants' agent. I did not, however, address questions about the scope or parameters of Thabet's authority. On this motion, the material issue is whether the scope of Thabet's authority allowed him to enter into the purchase agreement on behalf of the Levasseur Defendants.

■ An agent's authority may be actual or apparent. Actual authority exists when an agent has the power "to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestation to him." *Minskoff v. American Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir.1996) (quoting Restatement (Second) of Agency § 7 cmt. a (1958)). Actual authority may be express or implied. The distinction between express and implied actual authority turns on the nature of the repre-

---

**4.** The purchase agreement at issue provides that New York law governs its construction and enforcement.

sentation by which the principal delegates authority to that agent. Express authority is "[a]uthority distinctly, plainly expressed, orally or in writing." *Nationwide Life Ins. Co. v. Hearst/ABC–Viacom Entm't Servs.,* 1996 WL 263008, at *8 (S.D.N.Y. May 17, 1996) (quoting Black's Law Dictionary 521 (5th ed.1979)), while implied authority exists "when verbal or other acts by a principal reasonably give the appearance of authority to the agent." *99 Commercial St., Inc. v. Goldberg,* 811 F.Supp. 900, 906 (S.D.N.Y.1993). In addition, as Judge Weinfeld explained, under New York law,

> "Implied authority" has also been defined as "a kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers." The general rule in New York with regard to implied authority is that "an agent employed to do an act is deemed authorized to do it in the manner in which business entrusted to him is usually done."

*Songbird Jet Ltd., Inc. v. Amax, Inc.,* 581 F.Supp. 912, 919 (S.D.N.Y.1984).

■ "Apparent authority is 'entirely distinct from authority, either express or implied,' and arises from the 'written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.'" *Minskoff,* 98 F.3d at 708 (citations omitted) (quoting Restatement (Second) of Agency § 8 cmt. a, § 27 (1958)). Thus, in contrast to actual authority, apparent authority does not turn on the representations made by a principal to his agent, but rather on whether the representations made by the principal to a *third party* created the appearance of authority. These representations, however, need not be made through actual contact between the principal and third party. *See Chem. Bank v. Affiliated FM Ins. Co.,* 169 F.3d 121, 130 (2d Cir.1999); *Prop. Advisory Group, Inc. v. Bevona,* 718 F.Supp. 209, 211 (S.D.N.Y.1989); *Gen. Motors Acceptance Corp. v. Finnegan,* 156 Misc.2d 253, 255, 592 N.Y.S.2d 570, 572 (N.Y.Sup.Ct. 1992).

While there exist disputed issues of fact about the parameters of Thabet's actual authority, there is no dispute that he had apparent authority to bind Clermont Levasseur to purchase FL–165.

a. *There is a Disputed Issue of Fact Concerning Express Actual Authority*

■ Hidden Brook argues that Thabet had express actual authority to enter into the purchase agreement. To support this argument, Hidden Brook first points to Thabet's deposition testimony, in which he states that he showed the Levasseur Defendants a copy of the purchase agreement before he signed it, and they authorized him to sign it. Second, Hidden Brook refers the Court to the letters exchanged between the Levasseur Defendants and Raytheon in which the Levasseur Defendants admit that they are bound by the purchase agreement signed by Thabet. Third, Hidden Brook argues that the Levasseur Defendants' conduct after Thabet signed the purchase agreement, such as registering FL–165 in Canada in their name and failing to request that Hidden refund the $200,000 deposit they paid on the plane, demonstrate they knew and approved of Thabet's actions.

The Levasseur Defendants offer little to counter this showing. Instead, they rely heavily on the fact that Thabet procured for himself a $50,000 commission from Hidden Brook and then hid that commission from the Levasseur Defendants.

■ The fact that Thabet deceived the Levasseur defendants, however, does not necessarily preclude Thabet from acting within his authority. Hidden Brook correctly cites to Judge Hand's opinion in *Ricketts v. Pennsylvania R. Co.,* 153 F.2d 757, 760 (2d Cir.1946), in which he explains:

> [A]n agent does not cease to be acting within the scope of his authority when he is engaged in fraud upon a third person.... We can see no distinction in principle between that situation and one in which the agent deceives, not the third person, but his principal.

Thus, an agent may deceive his principal with respect to a contract that it is within his authority to enter into, and that deception does not automatically negate such authority. It is true, that "an agent cannot bind his principal, even in matters touching his agency, where he is known to be acting for himself, or to have an adverse interest." *Wagner v. Nichols,* 5 A.D.2d 191, 194, 170 N.Y.S.2d 542, 545 (1st Dep't 1958) (quoting *Manhattan Life Ins. Co. v. Forty–Second & G. St. Ferry R. Co.,* 139 N.Y. 146, 151, 34 N.E. 776, 777 (1893)). But a principal is still liable on a contract made by his agent in such circumstances if "the party with whom the agent deals has no knowledge of the agent's faults and is not cognizant of any fact charging him or her with knowledge thereof." 2A N.Y. Jur.2d *Agency and Independent Contractors* § 279 (citations omitted).

Similarly, the Restatement (Second) of Agency states:

> A disclosed or partially disclosed principal is subject to liability upon a contract purported to be made on his account by an agent authorized to make it for the principal's benefit, although the agent acts for his own or other improper purposes, unless the other party has notice that the agent is not acting for the principal's benefit.

Restatement (Second) of Agency § 165 (1958).

The Levasseur Defendants do not allege that Hidden Brooks knew that Thabet was acting without his principals' knowledge and contrary to their interests. They describe Thabet's actions as "unethical, dishonest and illegal." That may not be an unfair characterization. But there is no evidence that Hidden Brook knew that Thabet was not authorized to ask for the $50,000 finder's fee. Indeed, on the undisputed evidence, Hidden Brook insisted that the fee be disclosed in the contract, and it was. There is no evidence that Hidden Brook knew anything about Thabet's duplicitous "whiting out" of the term in copies given to the Levasseur Defendants.

The Levasseur Defendants also assert that it is "ludicrous" to think that Levasseur would agree to a purchase agreement that included a "kickback" to Thabet, and that their conduct after Thabet signed the purchase agreement merely indicates that they wanted to purchase FL–165 and were preparing to do so. Neither of these assertions, however, raises a genuine issue for trial: The Levasseur Defendants cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986).

Nonetheless, there is still a genuine issue of fact concerning express authority. While Thabet testified that the Levasseur Defendants told him to sign the contract, Clermont Levasseur testified otherwise:

> Q: What I'd like you to do, Mr. Lavesseur, is take a look, please, at the ... Exhibit D to that affidavit. Can you identify that for us, please?

A: Purchase agreement for the 1997 King Air 350 aircraft, FL–165.

Q: Sir, in you capacity as the president of 161768 Canada, Inc., did you ever authorize Mr. Thabet or anyone from Thabet Aviation to sign this contract?

A: Never.

Mr. Rottenstreich: Objection to form.

Q: Did Mr. Thabet or anyone at Thabet Aviation have any authority whatsoever from you to sign any purchase agreements on behalf of 161768 Canada, Inc.?

A: Never.

The clash between Thabet's testimony and Levasseur's over Thabet's authority to sign the purchase agreement creates an issue of material fact. Hidden Brook urges the Court to rule that no trier of fact could find that Thabet did not have express authority to sign the contract despite Clermont Levasseur's testimony. I am sympathetic to Hidden Brook's position, but I cannot conclude as a matter of law that Thabet had express authority to sign the contract when the principal denies it. Express authority turns on the existence of oral or written communication between principal and agent, and conflicting testimony as to the existence of that communication creates a genuine issue of material fact.

b. *There is a Disputed Issue of Fact Concerning Implied Actual Authority*

 Hidden Brook next argues that Thabet had implied actual authority to sign the purchase agreement on behalf of the Levasseur Defendants. Hidden Brook asserts that (1) the Levasseur Defendants' words and conduct gave Thabet the reasonable impression that he was to execute the agreement on their behalf, (2) the prior course of conduct between Thabet and the Levasseur Defendants establishes that Thabet was entitled to assume he had authority, and (3) Thabet himself stated in his deposition that he was the Levasseur Defendants' agent.

Again, the Levasseur Defendants offer little in the way of contrary evidence. They prefer to distinguish a case that Hidden Brook cites and set forth a series of rhetorical questions.

Nonetheless, I must deny summary judgment on the question of implied authority as well. As Hidden Brook candidly admits, "Thabet was not required to use his discretion in any way to serve the Levasseur Defendants. The defendants do not allege that he was required to use his discretion, and the record evidence could not support a finding that he was so authorized." [Hidden Brook Reply 5] In other words, there is ample evidence in the record, viewed in the light most favorable to the non-moving party, that the Levasseur Defendants' conduct and words gave Thabet the impression that he only had authority whatever Levasseur told him he could do, and that he had no discretion to sign agreements that the Levasseur did not tell him he could sign. Clermont Levasseur expressly stated in his deposition that he did not give Thabet authority to enter into the purchase agreement. While a substantial amount of evidence supports Hidden Brook's assertion to the contrary, the evidence is not uncontroverted. The role of the Court on this motion "is not to resolve disputed issues of fact, but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inference against the moving party." *Knight*, 804 F.2d at 9.

c. *Thabet Had Apparent Authority to Bind Clermont Levasseur*

 In the alternative, Hidden Brook argues that the Levasseur Defen-

dants cloaked Thabet with apparent authority to bind them by signing the agreement on their behalf. "The existence of apparent authority is normally a question of fact, and therefore inappropriate for resolution on a motion for summary judgment." *Minskoff,* 98 F.3d at 708. But "a principal may be estopped from denying apparent authority if (1) the principal's intentional or negligent acts, including acts of omission, created an appearance of authority in the agent, (2) on which a third party reasonably and in good faith relied, and (3) such reliance resulted in a detrimental change in position on the part of the third party." *Id; see also Herbert Constr. Co. v. Continental Ins. Co.,* 931 F.2d 989, 993–96 (2d Cir.1991); *F.D.I.C. v. Providence Coll.,* 115 F.3d 136, 140 (2d Cir.1997); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* 2002 WL 88226, at *11 (S.D.N.Y. Jan. 23, 2002); *Hallock v. State,* 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178, 1181–82 (1984); *Ford v. Unity Hospital,* 32 N.Y.2d 464, 473, 346 N.Y.S.2d 238, 299 N.E.2d 659, 664 (1973).

The undisputed facts estop Clermont Levasseur from denying that Thabet had apparent authority to bind him. First, the original offer to purchase stated that the offer was being made on behalf of Clermont Levasseur. The offer to purchase expressly represented that Levasseur would purchase the plane if it successfully passed the pre-purchase inspection. Thabet and Hidden Brook signed this offer. The undisputed evidence demonstrates that Clermont Levasseur saw the signed offer to purchase no later than June 7 and did not repudiate it or indicate that its terms were inaccurate. And Levasseur held Thabet out as his sole representative in the transaction, and directed Hidden Brook to deal with Thabet rather than with him during his visit to Poughkeepsie. [Hidden Brook 56.1 Statement ¶ 21(g)] Thus, once the plane passed the pre-pur-

chase inspection, it was eminently reasonable for Hidden Brook to believe that Thabet could and would sign the purchase agreement.

Additionally, the Levasseur Defendants admit that a contract had to be in place well before closing. [Hidden Brook 56.1 Statement ¶ 38(c)] They further admit that the closing was scheduled, first for June 21, then for June 25. Their failure, during the time leading to the closing date, to determine whether Thabet had signed an agreement on their behalf and/or inform Hidden Brook that Thabet had no such authority was, at the very least, a negligent omission on their part.

The undisputed facts also make clear that Hidden Brook relied on Thabet's apparent authority, and that reliance resulted in a detrimental change in Hidden Brook's position. Hidden Brook arranged for the plane to be flown, at its expense, from New York to South Carolina for inspection. It also had a pilot travel to South Carolina to fly the plane to Quebec upon closing. Most important, it took the plane off the market once the $200,000 deposit was in escrow, thereby foregoing other offers.

■ The Levasseur Defendants argue that they could not have cloaked Thabet with apparent authority because they were undisclosed principals. As to the corporate defendant, that is correct. Neither the offer to purchase FL–165 nor the purchase agreement mentioned 161768 Canada, Inc., and none of the evidence before the Court suggests that any of the parties at any time mentioned the corporation during the negotiations to sell FL–165. 161768 Canada was therefore an undisclosed principal, and Hidden Brook could not possibly have thought that Thabet was

binding that corporation.[5] A jury must decide whether 161768 Canada, Inc. gave Thabet authority to deal on its behalf.

The undisputed facts show, however, that the Clermont Levasseur was a disclosed principal. "If, at the time of a transaction conducted by an agent, the other party thereto has notice that the agent is acting for a principal and of the principal's identity, the principal is a disclosed principal." Restatement (Second) of Agency § 4 (1958).[6] The original offer to purchase FL–165 that the Levasseur Defendants authorized Thabet to send Hidden Brook explicitly stated that it was on behalf of Clermont Levasseur. Field signed that offer. So as a matter of law Field had notice that Thabet was acting on behalf of a principal, as well as the identity of that principal. Similarly, Abrams met Levasseur in Poughkeepsie and was present while Levasseur inspected the plane. He, too, had notice of the principal's identity.

 To bind the corporation as well as Levasseur, Hidden Brook argues that apparent authority can arise even where the principal is undisclosed and cites two cases to support this argument. *Graffman v. Delecea*, 96 Civ. 7270, 1997 WL 620833, at \*5 (S.D.N.Y. Oct. 8, 1997); *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 51 F.Supp.2d 457, 475 (S.D.N.Y.1999) (citing *Graffman* ). These two cases, however, do not support Hidden Brook's argument. It is well settled that undisclosed principals cannot create apparent authority. *See Master Commodities, Inc. v. Texas Cattle Mgmt. Co.*, 586 F.2d 1352, 1358 (10th Cir.1978). The Restatement (Second) of Agency succinctly states that "apparent authority exists only with regard to those who believe and have reason to believe that there is authority; there can be no apparent authority created by an undisclosed principal." Restatement (Second) of Agency § 8 cmt. a (1958); *see also id.* at § 159 (1958) ("A *disclosed or partially disclosed* principal is subject to liability upon contracts made by an agent acting within his apparent authority if made in proper form and with the understanding that the apparent principal is a party.") (emphasis added).

 The Restatement's approach is persuasive. In order for apparent authority to exist, a third party must believe that an agent is able to act on behalf of a principal, regardless of whether the principal's identity is disclosed or whether there is actual contact between the principal and third party. Based on the record before me, there can be no dispute that Clermont Levasseur cloaked Thabet with the authority to enter into the purchase agreement with Hidden Brook, and that he is estopped to assert otherwise. Summary judgment on the question of agency is granted as against Clermont Levasseur.

---

**5.** 161768 Canada is (or appears to be) a family-owned and controlled corporation that Clermont Levasseur used as a vehicle to purchase airplanes. In 1999, for example, Thabet purchased an airplane in his own name for 161768 Canada. And the agreement between Levasseur and Raytheon for the purchase of FL–265, signed on June 24, states that the buyer is 161768 Canada. The parties do not consistently distinguish between the defendants Clermont Levasseur and 161768 Canada, Inc. Plaintiff and defendants alike refer to them as "the Levasseur Defendants." In the context of whether either defendant cloaked Thabet with apparent authority, however, I must make the distinction.

**6.** "A person has notice of a fact if he knows the fact, has reason to know it, should know it, or has been given notification of it." Restatement (Second) of Agency § 9 (1958). And "[a] person is given notification of a fact by another if the latter informs him of the fact by adequate or specified means or of other facts from which he has reason to know or should know the facts." *Id.*

### 2. The Contract is Valid, and is Neither Void nor Voidable

The Levasseur Defendants argue that the contract was void or voidable due to Raymond Thabet's machinations in procuring a $50,000 commission from Hidden Brook. First, they argue that Hidden Brook's agreement to pay Thabet $50,000 upon the sale of FL–165 to the Levasseur Defendants violated the New York Penal Law and thus voided the contract. Second, they argue that Thabet acted as a "dual agent" when he signed the purchase agreement, in which case they could void the contract at their discretion. Either of these arguments, if accepted by the Court, would require dismissal of Hidden Brook's claims against the Levasseur Defendants. However, neither withstands scrutiny.

### a. The Contract is not Void Due to Any Violation of the New York Penal Law

■■ According to the Levasseur Defendants, Hidden Brook violated Sections 180.00 and 180.03 of the New York Penal Law, which make it a crime to "confer, or offer to confer, any benefit upon an agent without the consent of the agent's principal." N.Y. Penal Law §§ 180.00, 180.03 (McKinney 2002). As Hidden Brook points out, however, the Levasseur Defendants fail to recite the statute in full. Sections 180.00 and 180.03 of the New York Penal Law, the provisions for commercial bribery in the first and second degree, state:

> A person is guilty of commercial bribing . . . when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's affairs.

N.Y. Penal Law § 180.00 (McKinney 2002). When we measure the undisputed evidence against the statutory standard, the Levasseur Defendants' argument falls short for two reasons.

■■ First, commercial bribery under New York law is not, as the Levasseur Defendants would have the Court believe, a strict liability offense. The statute clearly contains an intent requirement, and the intent to influence cannot be inferred solely from the act of conferring a benefit. See Stat Med. Servs., Inc. v. Daughters of Jacob Geriatric Ctr., Inc., 797 F.Supp. 253, 256–57 (S.D.N.Y.1992).

■■ Second, commercial bribery requires that the guilty party intend to *influence* an agent's conduct. In other words, the commercial briber must seek some sort of *quid pro quo*. The Levasseur Defendants offer no evidence that Hidden Brook intended to influence Thabet by paying him the $50,000. By contrast, Hidden Brook's undisputed evidence demonstrates that plaintiff never asked Thabet to do anything improper for the $50,000 fee. Levasseur's response to that showing is to recite his conclusory mantra: The agreement between Hidden Brook and Thabet was "unethical, dishonest and illegal." [Levasseur Defendants 56.1 Statement ¶ 69] Unfortunately, the Levasseur Defendants may not rely on "conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d at 114.

Levasseur also cites to deposition testimony from Abrams, in which he discusses a practice by which agents manage to generate commissions from both the seller and buyer of an airplane. However, Abrams does not tend to establish that Hidden Brook asked Thabet to act against the Levasseur Defendants' interests. To the contrary, Abrams testified that Field insisted that Thabet's fee be disclosed in the purchase agreement. [Levasseur Defen-

dants Decl. Ex. F, Abrams Dep. 118–20] His deposition thus does not raise a genuine issue of material fact.

 b. *The Contract is Not Voidable Because Thabet Did Not Act as a "Dual Agent"*

█ The Levasseur Defendants also contend that the $50,000 payment to Thabet rendered the contract voidable under the dual agency doctrine. That doctrine provides that "[w]hen an agent without the knowledge and consent of his principal represents an adverse party in a transaction, his contracts relating thereto are voidable at the option of the principal." *Bernstein v. Centaur Ins. Co.,* 644 F.Supp. 1361, 1370 (S.D.N.Y.1986); *see also Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland Ltd.,* 835 F.2d 32, 36 (2d Cir.1987); *Alvin S. Schwartz, M.D., P.A. Employer/Employee Profit Sharing Plan v. O'Grady,* No. 86 Civ. 4243, 1990 WL 156274, at *5 (S.D.N.Y. Oct. 12, 1990). The policy underlying this doctrine is that when an agent "act[s] for adverse interests he must necessarily be unfaithful to one or the other as the duties which he owes to his respective principals are conflicting and incapable of faithful performance by the same person." *Hasbrouck v. Rymkevitch,* 25 A.D.2d 187, 188–89, 268 N.Y.S.2d 604, 606 (3d Dep't 1966). Hidden Brook does not dispute that the Levasseur Defendants were unaware of the $50,000 payment and did not consent to the payment. The primary question is whether the $50,000 payment made Thabet a "dual agent." [7]

█ The legal standard for dual agency under New York law is not entirely clear. Some sources suggest that, in order to be a dual agent, one must act as an agent, as that term is understood under the law, for two principals. *See Carr v. Nat'l Bank & Loan Co.,* 167 N.Y. 375, 379, 60 N.E. 649, 650 (N.Y.1901) (explaining that person "undertook to act as the agent of both parties"); *Bernstein,* 644 F.Supp. at 1370 (finding absence of dual agency because there existed virtually no "evidence that [the principal's agent] acted as an agent for [the third party]"). An agent, stated succinctly, is "one who agrees to act on behalf of another, subject to the other's control." *Campbell v. Int'l Bhd. of Teamsters,* 69 F.Supp.2d 380, 386 (E.D.N.Y. 1999). The Levasseur Defendants have pointed to no evidence suggesting Thabet agreed to act on Hidden Brook's behalf or subject to its control. Thus, Thabet does not qualify as a dual agent under the *Carr* standard.

There is, however, a second way in which one could qualify as a dual agent. The Restatement (Second) of Agency provides:

> An agent employed by a principal to conduct a transaction violates his duty to the principal if, without the knowledge of the principal, he serves as the agent for the other party to the transaction, *or if he contracts to serve the other party to the transaction in a manner inconsistent with his duties to the principal.*

Restatement (Second) of Agency § 313 cmt. a (1958) (emphasis added). Thus, under the Restatement Thabet need not have acted as Hidden Brook's agent, but must only have contracted to serve Hidden Brook in a manner inconsistent with his duties to the Levasseur Defendants. Language in the relevant New York case law seems to adhere to this position. *See Bernstein,* 644 F.Supp. at 1370; *Hasbrouck,* 25 A.D.2d at 188, 268 N.Y.S.2d at 606 ("It is fundamental that an agent can-

---

7. Under the dual agent doctrine, it is not necessary that Hidden Brook acted in bad faith or had a fraudulent motive. *See Carr,* 167 N.Y. at 379, 60 N.E. at 650.

not take unto himself incompatible duties, or act in a transaction where he represents a person having an adverse interest."); *see also* 2A N.Y. Jur.2d *Agency and Independent Contractors* § 227. Unfortunately, there is no evidence that Thabet served anyone except himself in a manner inconsistent with the Levasseur Defendants' interests–certainly not Hidden Brook.

 Moreover, whatever the standard, it is well-established that the alleged dual agent's acts on behalf of the parties in the transaction must not be "merely ministerial." *Bernstein,* 644 F.Supp. at 1370. Ministerial acts are those that "involve[ ] obedience to instructions or laws instead of discretion, judgment, or skill." Black's Law Dictionary 1011 (7th ed.1999). Thus, Thabet must at the very least have been able to exercise discretion for either party. *See Empire State Ins. Co. v. American Cent. Ins. Co.,* 34 N.E. 200, 201, 138 N.Y. 446, 449 (1893); *Schwartz,* 1990 WL 156274, at *5.

There is nothing in this record to suggest that Thabet exercised discretion in his work on behalf of anyone. The Levasseur Defendants allege that they had to approve every action Thabet took, and there is no evidence that Hidden Brook ever asked him to perform any act on its behalf. Thus, Thabet did not procure the $50,000 commission by way of any discretion invested in him by either the Levasseur Defendants or Hidden Brook. For that reason, too, the dual agency argument fails. The issues of voidness and voidability are resolved in plaintiff's favor.

### 3. *The Parties' Performance*

In order to prevail, Hidden Brook must also show that it performed under the terms of the contract, while Levasseur did not. *Nakano,* 2000 WL 680365, at *5. The parties do not dispute that the original closing date was set for June 21, and that

Hidden Brook granted the request for an extension until June 25. Hidden Brook claims that Thabet called Abrams on June 25 and told him that the deal was off because the Levasseur Defendants had purchased a new plane from Raytheon. The Levasseur Defendants claim that they intended to purchase FL–165 on June 25, and were unable to do so only because Hidden Brook told them that it would not deliver the aircraft if the balance due was not paid on or before 11 a.m. on June 25– an hour or so before they received financing.

If Levasseur had to perform by 11 a.m. on June 25, he breached the contract. Whether Levasseur was required to perform by 11 a.m. turns on the facts surrounding the extension Hidden Brook granted, and the legal consequences that follow from that extension.

The purchase agreement states that the "[f]inal sale closing and delivery of [FL–165] ... from SELLER to PURCHASER is to take place ... on or about June 21, 1999, but in any event not later than six (6) days after export certification from Stevens Aviation." [Hidden Brook Decl. Ex. 56] Under these explicit contract terms, the closing was originally to occur no later than June 22. That is because Thabet obtained an "Export Certificate of Airworthiness" for FL–165 on June 16. The original closing date, June 21, was within this time frame. The Levasseur Defendants explain, in their response to Hidden Brook's motion for summary judgment, that "an extension was agreed upon up to and including June 25, 1999. The extension was granted orally." [Levasseur Defendants Memorandum of Law 13] Hidden Brook admits in its motion papers that it agreed to an extension until June 25. But it does not address who agreed to the extension, what was said, or how that

agreement was communicated to Levasseur.

■■■ Hidden Brook argues that the parties' agreement to change the closing date constituted an enforceable modification of their original contract. [Hidden Brook Reply 8] However, under Article 2 of New York's Uniform Commercial Code, "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded" except in situations inapplicable to the present case. N.Y. U.C.C. § 2–209(2) (McKinney 2002).[8] The purchase agreement states that "[n]o agreement or understanding varying the terms and conditions hereof shall be binding upon either party hereto unless in writing and signed by a duly authorized representative of both parties." [Hidden Brook Decl. Ex. 56] Thus under New York law, the oral agreement to extend the closing date to June 25 did not constitute a modification of the purchase agreement.[9] *See Elmsford Sheet Metal Workers, Inc. v. Shasta Indus.,* 103 A.D.2d 764, 764, 477 N.Y.S.2d 391, 391–92 (1st Dep't 1984).

■■■ But an attempt at modification that runs afoul of the U.C.C.'s provisions upholding no-oral-modification clauses can operate as a waiver. N.Y. U.C.C. § 2–209(4) (McKinney 2002); *Congress Talcott Corp. v. Shapiro,* 176 A.D.2d 551, 574 N.Y.S.2d 732 (1st Dep't 1991). A waiver is the "voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable." *Gen. Motors Acceptance Corp. v. Clifton–*

*Fine Cent. School Dist.,* 85 N.Y.2d 232, 236, 623 N.Y.S.2d 821, 647 N.E.2d 1329, 1331 (1995), *quoted in IBJ Schroder Bank & Trust Co. v. Fairfield Communities, Inc.,* 178 F.3d 78, 84 (2d Cir.1999). The legal implications of a waiver differ from those of an enforceable modification. The statute of frauds, for example, may apply to modifications but does not apply to waivers. *See* E. Allan Farnsworth, *Contracts* § 8.5 (2d ed.1990).

I find that, while Hidden Brook and the Levasseur Defendants could not orally "modify" the purchase agreement, their oral agreement operated, as a matter of law, as a waiver of the provision that the closing was to occur "on or about June 21, 1999, but in any event not later than six (6) days after export certification."

■■■ Under the contract's original terms, either party would have breached the contract if it was unable to close the deal on or before June 22. In other words, time was of the essence. That is because when "a contract specifies a definite time for delivery ... New York law requires the provisions specifying the date or dates for delivery to 'be strictly enforced in a contract action at law. In such an action, the parties are presumed to have agreed that time is of the essence.'" *Shipsview Corp. v. Beeche Sys. Corp.,* No. 94 Civ. 786, 1996 WL 590910, at *4 (N.D.N.Y. Oct. 10, 1996) (quoting *Towers Charter & Marine Corp. v. Cadillac Ins. Co.,* 894 F.2d 516, 523 (2d Cir.1990)).

■■■ Time is not of the essence, however, "where the parties have waived

---

8. The sale of FL–165 constitutes a sale of goods under the New York U.C.C., so that statute applies. *See, e.g., Aviation Dev. Co. v. C & S Acquisition Corp.,* No. 97 Civ. 9302, 1999 WL 46630, at *11 (S.D.N.Y. Feb. 2, 1999).

9. Even if the purchase agreement did not preclude non-written modifications, any modifications would still have had to satisfy the statute of frauds. N.Y. U.C.C. § 2–209(3) (McKinney 2002) ("The requirements of the statute of frauds ... must be satisfied if the contract as modified is within its provisions.").

time as an essential element of the contract." *Id.* By waiving the June 22 closing deadline, Hidden Brook presumptively indicated that time was not of the essence.

■■■■ The analysis does not end here, however:

Either party ... may make or restore time as of the essence whenever it desires, simply by giving notice to that effect. The notice must be clear, distinct and unequivocal; fix a reasonable time within which to act; and inform the other party that failure to perform by that date will be considered a default.

*Id.*

A genuine issue of material fact exists as to whether Hidden Brook met the standard for reimposing time as of the essence. The facts sufficiently establish that Levasseur knew on June 22 that he had to close on FL–165 by June 25. He said as much in a letter to Spencer dated June 22, where he wrote that "there will be no delay from the owner of the Super King Air 350, FL–165, to pursue any discussion. We have to purchase the plane by Friday, June 25, 1999."

But it is unclear from the record when the 11 a.m. deadline appeared. The appearance of this "drop dead" hour is relevant because it goes to the issue of whether Levasseur was given a reasonable time within which to perform.

Levasseur claims that he wanted to close on FL–165, but could not close by 11 a.m. because he did not receive financing until later that day. "The deal fell through," he argues, "because Hidden Brook Air advised Thabet that Hidden Brook Air would not deliver the aircraft if the balance due was not paid to the escrow agent on or before 11 a.m. on June 25, 1999." [Levasseur Defendants 56.1 Statement ¶¶ 55–56]

To support this assertion, the Levasseur Defendants refer the Court to (1) Thabet's deposition testimony, and (2) affidavits by their financial consultant Raynald Arial ("Arial") and Therese Levasseur, an officer of 161768 Canada, Inc. Hidden Brook argues that the affidavits are inadmissible, and directs the Court to evidence that it argues demonstrates that no reasonable trier of fact could find that Levasseur intended to close on FL–165 at any time on June 25.

■■■■ I will not consider those portions of the affidavits that tend to establish that Levasseur intended to purchase FL–165 on June 25. Therese Levasseur and Arial state that Clermont Levasseur directed them to close on FL–165 if the funding came through by 11 a.m. These statements are inadmissible hearsay, and therefore not competent to raise a genuine issue of material fact. *See, e.g., Sarno v. Douglas–Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999).

However, the record, even absent these affidavits, does create a genuine issue of material issue. First, Thabet testified that he sought an additional extension of the closing date, and that Field refused that request and demanded a closing by midday or whereabouts on June 25:

Q: Now, towards the end when this alleged deal was falling through you said that you asked for one extension and you got it; is that right?

A: Yes. Was hard to have it, but we had it.

Mr. Rottenstreich: Objection to the form.

Q: All right. So you got the extension from I think you said June 22 to June 25; is that correct?

A: Yes, three days.

Q: Did you ask for another extension on the 25th.

A: Yes.

Q: I got confused with your testimony earlier. What was the response to that request?

A: Not good.

Q: Tell me what it was.

A: I guess the seller [Field] wanted to sell his plane and he was expecting to get paid on the 22, and he didn't believe that we could go further and make the payment and then he decide, he gave us like a threat, you know, he said if you don't buy by noon this date or by one o'clock, I don't remember, it's no more deal, don't call me back.

Q: And that was noon on the 25th?

Mr. Rottenstreich: Objection.

A: Maybe 28th, 25th.

Q: Which would be Monday?

A: Mm-hmm.

Q: Is that right?

A: Came to a Friday, maybe two days, maybe 28th. What's -

Mr. Eliot Levasseur: Friday the 25th.

A: 25th was a Friday. That was the ends on Friday.

Q: So there was only one extension?

A: That's it. We didn't get the second.

Q: You didn't get the extension

A: No.

Q: Did you ask for the second extension, that was my question?

A: Yes.

Q: Did you ask for the second extension on the 25th of June?

A: I did the 24.

Q: You asked for the extension on the 24th?

A: Yes.

Q: Did you do that in writing?

A: No, I called.

Q: Who did you call?

A: Marshall Field.

Though Thabet did not recall precisely when Field's "drop dead" hour was–only that it was in the middle of the day [10]–this testimony seems to indicate that Field imposed the 11 a.m. deadline on June 24.

Second, Levasseur testified:

A: ... I was asking for delay, to Thabet, and what he responded was telling me you've got three more days, if you don't, after three days 11 o'clock then you die, you know. There was another purchaser for the airplane and if you're not completion that by the 25th that's the maximum dat that Mr. Marshall was giving to him.

Q: How much time did you want?

A: I said–I was always telling to Thabet that a frame, you know, to accomplish from–if you lose, each day that you lose from June 1 to June—you need 15 days to accomplish a deal like that. And Thabet came back to me and was surprising this thing today, he was telling me that I only got three days because he's got—because Mr. Marshall was putting a gun on his head he said and he said we don't have much choice....

. . . . .

Q: If it's June 21, 1999 and you don't have a contract in you hands and the conditions haven't been satisfied, you would need about 15 days to satisfy the conditions and get everything in order?

A: And get everything in order, right.

Q: That would put you into July?

A: I was–I was ready to continue this negotiation, no problem there.

[Hidden Brook Decl. Ex. 3, Thabet Dep. 190]

---

10. He said elsewhere in his deposition testimony that the drop-dead time was 2 p.m.

[Hidden Brook Decl. 2 Ex. 9, Levasseur Dep. 360–61] Levasseur also testified that he tried to find financing on short notice, stating that "on June 24 there was some discussion on phone to find some finance [from Newcourt Finance] as rush, even if it was holiday." [11] [Hidden Brook Decl. Ex. 4, Levasseur Dep. 357–58]

Third, the Levasseur Defendants received a letter from Newcourt Finance dated June 25. The letter approves 161768 Canada for "5 MILLION CND FINANCING OF KING AIR 350 AIR-CRAFT." [Hidden Brook Decl. Ex. 27] Though the exhibit does not contain any time stamp, the legend on the letter indicates that it was received around 12:50 p.m.

This evidence is sufficient to defeat Hidden Brook's motion for summary judgment. There is a genuine issue of fact whether Levasseur would have closed on FL–165 had he received financing before 11 a.m. on June 25, and whether he had a reasonable time to close once or if Field made time of the essence again. The key question on the latter point is precisely when the 11 a.m. deadline was imposed.

### 4. Damages

Because issues related to the question of breach of contract must go to trial, I would ordinarily skip the issue of damages. However, Hidden Brook has made a motion in limine concerning mitigation of damages. I take this opportunity to resolve it.

Hidden Brook claims that under the relevant provisions of the U.C.C. it is entitled to (1) $350,000 in compensatory damages, (2) incidental and consequential damages, (3) costs and reasonable attorney's fees pursuant to Section 11 of the purchase agreement [Hidden Brook Decl. Ex. 19],

and (4) pre-judgment interest. The Levasseur Defendants argue that Hidden Brook failed to mitigate its damages. The issue of whether Hidden Brook mitigated its damages, they contend, is for the jury, because there is a question about whether Hidden Brook resold the plane in a commercially reasonable manner.

However, as a matter of law, Hidden Brook had no obligation to mitigate its damages in a commercially reasonable manner. Indeed, it had no obligation to mitigate its damages at all. There is, therefore, no disputed issue of commercial reasonableness for the jury to resolve.

Hidden Brook argues that section 2–709(1)(a) of New York's U.C.C. governs the measure of damages in this case. Section 2–709 sets forth circumstances in which an aggrieved seller may recover damages for the price of the good contracted for sale. See N.Y. U.C.C. § 2–709(1)(a) (McKinney 2002). "In order to recover an action for the price pursuant to Section 2–709(1)(a) of the New York Uniform Commercial Code, plaintiffs must show that 1) they had a contract; 2) the buyer failed to pay the purchase price; and 3) the buyer accepted the goods." Weil v. Murray, 161 F.Supp.2d 250, 254–55 (S.D.N.Y.2001). As explained above, a contract existed and Levasseur failed to pay the purchase price. The applicability of section 709(1)(a) turns on whether Levasseur accepted FL–165.

Acceptance of goods occurs when a buyer (a) signifies to the seller that the goods are conforming after a reasonable opportunity to inspect them, (b) fails to make an effective rejection after a reasonable opportunity for inspection, or (c) acts inconsistently with the seller's ownership. N.Y. U.C.C. § 2–606 (McKinney 2002).

---

**11.** June 24 is apparently a national holiday in Canada.

Hidden Brook argues that Levasseur had a reasonable opportunity to inspect FL–165 and signified to Hidden Brook that it was conforming.

According to Hidden Brook, Section 4 of the purchase agreement sets out the mechanism by which Levasseur would accept FL–165. That provision states:

> After receipt of written notification, via facsimile, by SELLER and ESCROW AGENT that PURCHASER has completed the [Pre-purchase Aircraft Inspection ("PAI") at Stevens Aviation] as defined above in section Three (3) of this Agreement and determined through the inspection that the PAI and the purchase of the AIRCRAFT is ACCEPTED, PURCHASER agrees that the then TOTAL DEPOSIT funds then held by ESCROW AGENT in the sum of 200,-000 USD are NON–REFUNDABLE and to be held in escrow by ESCROW AGENT, pending final sale closing. SELLER, PURCHASER and ESCROW AGENT agree that the then NON–REFUNDABLE deposit shall be returned to PURCHASER, in the event the AIRCRAFT is materially damaged after acceptance of PAI, or is not in compliance with other terms and conditions of this Purchase Offer Agreement at the date and time of final sale closing. [Hidden Brook Decl. Ex. 19]

If Hidden Brook is correct, then acceptance occurred when it received written notification that the pre-purchase inspection was complete and that the aircraft was acceptable. That occurred on June 21.

Levasseur argues that it was not Section 4 of the purchase agreement that defined how he was to accept FL–165, but rather Section 6. Section 6 states:

> Final sale closing and delivery of the AIRCRAFT ... from SELLER to PURCHASER is to take place in Que-

bec, Canada ... on or about June 21, 1999, but in any event not later than six (6) days after export certification from Stevens Aviation.... Title to and risk of loss shall pass from SELLER to PURCHASER upon delivery thereof in Quebec, Canada ..., and PURCHASER does hereby unconditionally release, indemnify and hold SELLER harmless from any and all claims, demands, judgments, liabilities, damages and causes of action whatever nature, known or unknown, arising out of or in any way related to the ownership or operation of the AIRCRAFT after final sale closing and delivery. [Hidden Brook Decl. Ex. 19]

If Levasseur is correct, acceptance was to occur when title passed.

I find the purchase agreement to be unambiguous. Section 4 addresses how Levasseur was to accept FL–165. According to that contractual provision, the plane was to be inspected at Stevens Aviation. Levasseur could then accept or reject the inspection results at his "reasonable discretion." [Hidden Brook Decl. Ex. 19, ¶ 3]. If satisfied with the results, Levasseur was then to fax Hidden Brook and the escrow agent written notification that he had determined, "through the Inspection that the PAI and the purchase of the AIRCRAFT is ACCEPTED." *Id.* at ¶ 4. Upon receipt of that fax by Hidden Brook and the escrow agent, the goods were accepted and the $200,000 deposit became non-refundable. That constitutes acceptance as a matter of law.

█ No reasonable trier of fact could find that Levasseur did not have a reasonable opportunity to inspect FL–165. He *did* inspect the plane–twice. *See Weil,* 161 F.Supp.2d at 256 (taking into account actual inspection in determining whether reasonable opportunity existed on motion for

summary judgment). He visited Poughkeepsie and visually inspected the plane himself. The plane was also sent to Stevens Aviation, where it underwent further inspection, as provided for in the purchase agreement.

▐ Thereafter, on June 21, Thabet faxed Abrams a copy of a document he had sent to the escrow agent, which stated: "We are satisfied with the inspection and all the discrepancy's [sic] have been repaired and accomplished by Stevens Aviation ordered by Hidden Brook Air Inc and we accept the pruchase [sic] of the aircraft." [Hidden Brook Decl. Ex. 33] This fax is clear on its face. Because it was sent after a reasonable opportunity for inspection, it effectuated an acceptance of FL–165 by Clermont Levasseur.[12] Accordingly, I find that Hidden Brook may maintain an action for the price pursuant to section 709(1)(a).[13]

Levasseur argues that inspection can result in acceptance only when such inspection occurs pursuant to delivery, which was to occur when title passed. This argument is meritless. See 67 Am.Jur.2d Sales § 623 (2002) ("Acceptance in Code terminology is a term of art which is unrelated to the question of passage of title from the seller to the buyer, and is only tangentially related to buyer's possession of goods."). A buyer has a right of reasonable inspection before acceptance when "goods are tendered or delivered or identified to the contract for sale." N.Y. U.C.C. § 2–513 (McKinney 2002) (emphasis added). In this case, FL–165 was identified to the contract from its inception. See N.Y. U.C.C. § 2–501(1)(a) (McKinney 2002) ("In the absence of specific agreement identification occurs when the contract is made if it is for the sale of goods already existing and identified."). Levasseur therefore had a right, before he accepted FL–165, to "inspect [the plane] at any reasonable place and time and in any reasonable manner" N.Y. U.C.C. § 2–513 (McKinney 2002).

▐ Acceptance occurs under section 2–606(1)(a) if the buyer has a reasonable opportunity to inspect the goods and then signifies to the seller that the goods are conforming. N.Y. U.C.C. § 2–606(1)(a) (McKinney 2002).[14] The buyer's possession of the goods is not necessary for there to have been a reasonable opportunity to inspect. Rather possession only indicates whether there has been such an

---

12. For the same reasons that Thabet had the apparent authority to enter into the purchase agreement (enumerated above), Levasseur also cloaked Thabet with the apparent authority to signify to Hidden Brook that the plane was conforming. The corporation's status is not amenable to summary judgment.

13. The language of Section 4 tracks (perhaps intentionally) U.C.C. § 2–606(1)(a), which provides that "[a]cceptance of goods occurs when the buyer after a reasonable opportunity for inspection signifies to the seller that the goods are conforming." N.Y. U.C.C. § 2–606 (McKinney 2002).

14. Section 2–606–(1)(a) differs from 2–606(1)(b), under which acceptance occurs when a buyer has a reasonable opportunity to inspect and fails to effectively reject the goods. Section 2–602(1), which is cross-referenced in 2–606(1)(b), provides that "[r]ejection of goods must be within a reasonable time after their delivery or tender." N.Y. U.C.C. § 2–602(1) (McKinney 2002). Thus, acceptance due to failure to reject must occur upon delivery or tender, while acceptance pursuant to signification that the goods are conforming may also occur once the goods are identified to the contract. In either case, the buyer's possession is not necessary, because a seller can retain possession upon tender. See N.Y. U.C.C. § 2–503(1) (McKinney 2002) ("Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery.").

opportunity. *See Weil*, 161 F.Supp.2d at 256 (taking into account as one factor buyer's possession of good in determining whether reasonable opportunity existed on motion for summary judgment); *N. Bloom & Son (Antiques) Ltd. v. Skelly*, 673 F.Supp. 1260, 1266 (S.D.N.Y.1987) (finding reasonable opportunity for inspection even though defendant never possessed the goods).

 Thus, if the Levasseur Defendants (or either of them) breached the purchase agreement, Hidden Brook acted within its rights when it resold FL–165. That is because section 2–709(2) provides that "if resale becomes possible [the seller] may resell [the goods] at any time prior to the collection of the judgment," and "[t]he net proceeds of any such resale must be credited to the buyer." N.Y. U.C.C. § 2–709(2) (McKinney 2002). *See generally Shokai Far East Ltd. v. Energy Conservation Sys., Inc.*, 628 F.Supp. 1462, 1466–67 (S.D.N.Y.1986). Section 2–709's resale provision contrasts with other parts of the New York U.C.C. that allow resale. Section 2–706, for example, allows a seller to resell the goods and recover the difference between the resale price and the contract price if "the resale is made in good faith and in a commercially reasonable manner." N.Y. U.C.C. § 2–706 (McKinney 2002). But section 2–709(2) does not require that a resale be "commercially reasonable," and this Court will not read such a requirement into the statute.

The cases to which the Levasseur Defendants cite are inapposite. Those cases involve either common law contracts or U.C.C. provisions other than section 2–709. *See Kerr S.S. Co. v. Radio Corp. of Am.*, 245 N.Y. 284, 157 N.E. 140 (1927) (services contract); *Drummond v. Morgan Stanley & Co.*, No. 95 Civ.2011, 1996 WL 631723 (S.D.N.Y. Oct. 31, 1996) (sale of bonds); *Hilord Chem. Corp. v. Ricoh Elec., Inc.*,

875 F.2d 32, 38 (2d Cir.1989) (addressing buyer's consequential damages under 2–715(2)(a)); *Drutman Realty Co. v. Jindo Corp.*, 865 F.Supp. 1093, 1100 (S.D.N.Y. 1994) (commercial lease under New Jersey law); *Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 530, 543 (S.D.N.Y. 2001) (Article 9 of the U.C.C.); *B.N.E. Swedbank, S.A. v. Banker*, No. 89 Civ. 7322, 1993 WL 152392, at *4 (S.D.N.Y. Mar. 8, 1993) (sections 2–706 and 2–708). The U.C.C.'s statutory framework does not necessarily displace all of the common law of contract. *See* N.Y. U.C.C. § 1–103 (McKinney 2002). But cases interpreting section 2–709 have not found a duty to mitigate. *See Siemens Energy & Automation, Inc. v. Coleman Electrical Supply Co.*, 46 F.Supp.2d 217, 218–19 (E.D.N.Y. 1999).

 As Hidden Brook points out, the default duty of "good faith" applies to the sale in mitigation. N.Y. U.C.C. § 1–203 (McKinney 2002). In this context, good faith means "honesty in fact in the conduct or transaction concerned." N.Y. U.C.C. § 1–201(19) (McKinney 2002). The Levasseur Defendants can prevail on this point only by introducing evidence that Hidden Brook acted dishonestly in arranging to resell the plane.

 Hidden Brook also argues that, under the U.C.C., it is entitled to both consequential and incidental damages if Levasseur is found to be in breach. However, section 2–709, unlike other sections of the U.C.C. provides only for the recover of incidental damages, not consequential damages. *Compare* N.Y. U.C.C. § 2–714 (McKinney 2002) (allowing buyer to recover incidental and consequential damages); *with* N.Y. U.C.C. § 2–709(1)(a) (McKinney 2002) ("[T]he seller may recover, together with any incidental damages under [section 2–710], the price of goods accepted."). The U.C.C. defines incidental damages as

"any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach." N.Y. U.C.C. § 2–710 (McKinney 2002). The jury will determine what "commercially reasonable" incidental damages Hidden Brook incurred due to Levasseur's breach of the purchase agreement. It will not determine consequential damages.

■ As a part of its incidental damages, Hidden Brook is entitled to prejudgment interest. *See Weil*, 161 F.Supp.2d at 257. The total amount of this interest is contingent on the amount of Hidden Brook's other incidental damages.

Finally, pursuant to the purchase agreement, Hidden Brook is also entitled to "all costs and reasonable attorney's fees incurred to enforce its rights under [the] Agreement." [Hidden Brook Decl. Ex. 19, ¶ 11] The amount of these fees will be determined at trial.

### B. *Hidden Brook's Motion for Summary Judgment on the Levasseur Defendants' Counterclaim, for Breach of Contract, is Denied*

For the same reasons that I was unable to grant Hidden Brook's motion for summary judgment on its claim that Clermont Levasseur breached the purchase agreement, I must also deny Hidden Brook's motion for summary judgment on the Levasseur Defendants' counter-claim that Hidden Brook breached the agreement.

As explained above, performance by the plaintiff (on this claim, the Levasseur Defendants) and non-performance by defendant (Hidden Brook) are essential elements of an action for breach of contract under New York law. *Nakano*, 2000 WL 680365, at *5. Whether Hidden Brook gave the Levasseur Defendants a reasonable time within which to tender "time is of the essence" performance is material to the issue of performance.

### C. *The Cross–Motions Relating to Raytheon are Denied*

Raytheon asks the Court to grant summary judgment in its favor with respect to Hidden Brook's claim of tortious interference with contractual relations. It supports this request with three arguments: (1) Quebec law applies to this claim and does not recognize such a cause of action, (2) the economic justification defense precludes Hidden Brook from sustaining its claim of tortious interference, and (3) the undisputed facts establish that Raytheon had no knowledge of the contract between Hidden Brook and the Levasseur Defendants, a necessary element of Hidden Brook's claim. Hidden Brook cross-moves for summary judgment on this same claim. It argues that New York law applies, and that the undisputed facts sufficiently establish all the necessary elements of its claim. Both motions are denied. However, I here resolve the choice of law issue in Hidden Brook's favor.

#### 1. *New York Law Applies*

Raytheon argues that Quebec law applies, and that since Quebec law does not recognize a cause of action for tortious interference with contractual relations, the Court should grant its motion for summary judgment. Hidden Brook argues that Raytheon failed to comply with the procedural requirements of Federal Rule of Civil Procedure 44.1, and in any case that New York law applies pursuant to the applicable choice of law analysis.

■ Rule 44.1 provides that "[a] party who intends to raise an issue concerning the law of a foreign country shall

give notice by pleadings or other reasonable written notice." Fed.R.Civ.P. 44.1. The purpose of the rule is "to avoid unfair surprise either to the opposing party or to the court." 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2443 at 640 (1995). It is typically sufficient for a party to give notice in their motion papers. *See Canadian Imperial Bank of Commerce v. Saxony Carpet Co.*, 899 F.Supp. 1248, 1253 (S.D.N.Y.1995) (holding that notice of intent to raise issue of foreign law made in motion for summary judgment constituted reasonable notice); *but see Local 875 I.B.T. Pension Fund v. Pollack*, 992 F.Supp. 545, 559 (E.D.N.Y.1998) (holding that notice of intent made in summary judgment reply papers did not constitute reasonable notice). Accordingly, the Court finds that Raytheon gave reasonable notice by raising the issue in its motion for summary judgment.

■■■ This Court must apply New York's choice of law rules, however, and under those rules Quebec law does not apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York uses an "interest analysis" in tort cases, under which the law of the jurisdiction having the greatest interest in the litigation applies. *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 196–97, 491 N.Y.S.2d 90, 480 N.E.2d 679, 683 (1985). To determine which jurisdiction has the greatest interest, the Court must look only to those facts or contacts that relate to the purpose of the particular laws in conflict. "Under this formulation, the significant contacts are, almost exclusively, the parties' domi-

ciles and the locus of the tort." *Id.* In addition, New York courts distinguish between loss-allocating and conduct-regulating rules. In the latter type of cases, the law of the locus jurisdiction generally applies. *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir.1992); *see also Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir.1996) ("Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct regulating laws."). As tortious interference with contractual relations is conduct-regulating, I must look to the locus of the tort to determine which jurisdiction's law should apply. *See Altschuler v. Univ. of Pennsylvania Law Sch.*, No. 95 Civ. 249, 1997 WL 129394, at *14 (S.D.N.Y. March 21, 1997).[15]

■■■ In this case, the site where Hidden Brook suffered damages due to Raytheon's allegedly tortious conduct determines the locus of the tort. That is because, "when 'the defendant's ... conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred.'" *Frink Am. Inc. v. Champion Mach. Ltd.*, 48 F.Supp.2d 198, 205 (N.D.N.Y.1999) (emphasis omitted) (quoting *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d at 90, 480 N.E.2d at 679). The tort of tortious interference with contract requires that the plaintiff suffer damages, which is the last event that would render a putative tortfeasor liable.

■■■ It is beyond dispute that Hidden Brook, a U.S. corporation, suffered

---

**15.** The Court notes that neither party to the tortious interference with contract claim, Raytheon or Hidden Brook, is domiciled in Quebec. Raytheon is domiciled in Kansas, its state of incorporation and principal place of business. Hidden Brook is incorporated in Delaware and Massachusetts is its principal place of business. Thus even were the parties' domiciles relevant to the choice of law analysis, this factor would in no way counsel application of Quebec law.

no damage in Quebec as a result of the actions of Raytheon, another U.S. corporation. Hidden Brook argues that it suffered damages in either Delaware, Massachusetts, or New York. Delaware and Massachusetts are, respectively, Hidden Brook's state of incorporation and principal place of business. Hidden Brook claims that it suffered loss in New York because (1) the proceeds of the sale of FL–165 would have ultimately ended up in Hidden Brook's New York bank account, (2) Hidden Brook paid out additional financing and insurance charges from its New York bank account due to Raytheon's alleged tortious interference, (3) Hidden Brook paid additional legal fees from its New York bank account to its New York counsel, (4) Field, Hidden Brook's sole shareholder and President, resides in New York, and (5) FL–165 was at all relevant times hangared in New York.

Regarding the modern "grouping of contracts" approach in general, the approach New York follows, the Restatement (Second) of Conflict of Laws explains that "In [cases of interference with contractual relations] the place of business is the more important contact. At least with respect to most issues, a corporation's principal place of business is a more important contact than the place of incorporation, and this is particularly true in situations where the corporation does little, or no, business in the latter place." Restatement (Second) of Conflict of Laws § 145 (1971). Delaware therefore drops out.

▮▮▮▮▮ Once Quebec and Delaware disappear, the analysis ends, because the law of tortious interference with an existing contract is not materially different in Massachusetts and New York. In Massachusetts, a plaintiff alleging tortious interference with contractual relations "must prove that: (1) he had a contract with a

third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *G.S. Enters., Inc. v. Falmouth Marine, Inc.*, 571 N.E.2d 1363, 1369, 410 Mass. 262, 272 (1991). Similarly, "[u]nder New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir.1996) *see also Don King Prods. v. Douglas*, 742 F.Supp. 741, 771–72 (S.D.N.Y.1990); *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289, 292 (1993); *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1375 (1996); *Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 134 N.E.2d 97, 99 (1956). Both Massachusetts and New York courts have adopted the Restatement (Second) of Torts' standard for determining what constitutes "improper" interference with an existing contract. *See Guard–Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 189–90, 428 N.Y.S.2d 628, 406 N.E.2d 445, 448 (1980); *G.S. Enterprises, Inc.*, 571 N.E.2d at 1369–70, 410 Mass. at 272–73 (1991). Under this standard, it is always improper for a competitor to induce a party to breach an existing contract (as opposed to otherwise interfering with a prospective contract). *See Guard–Life*, 50 N.Y.2d at 194, 428 N.Y.S.2d 628, 406 N.E.2d 445; *Melo–Tone Vending, Inc. v. Sherry, Inc.*, 39 Mass.App.Ct. 315, 319–20, 656 N.E.2d 312, 314–15, (1995).

"Laws are in material conflict if the differences in the laws 'have a significant possible effect on the outcome of the trial.'" *G–I Holdings, Inc. v. Baron & Budd,* 179 F.Supp.2d 233, 249 (S.D.N.Y. 2001). The Court can discern no significant possible effect on the outcome of the trial that would turn on whether Massachusetts or New York law applies, and in the absence of material conflict "[a] court is free to bypass the choice of law analysis and apply New York law." *G–I Holdings,* 179 F.Supp.2d at 249 (quoting *Simon v. Philip Morris, Inc.,* 124 F.Supp.2d 46, 70 (E.D.N.Y.2000)).

2. *Hidden Brook's Motion for Summary Judgment on its Tortious Interference Claim is Denied, as is Raytheon's Cross–Motion for Summary Judgment on That Claim*

As described above, Hidden Brook had a valid and binding agreement with the Levasseur Defendants. In order to sustain its tortious interference with contract claim against Raytheon, however, Hidden Brook must also prove that Raytheon intentionally induced the contract's breach. Because there is a genuine issue of material fact whether Levasseur breached the purchase agreement, I must deny Hidden Brook's motion for summary judgment.

3. *Raytheon's Cross–Motion is Also Denied*

Assuming New York law applies, Raytheon argues that summary judgment is warranted for two reasons: (1) the undisputed facts establish that it did not know about the contract between Hidden Brook and Levasseur and the defense of economic justification applies to their conduct as a matter of law. Both of these arguments fail.

a. *Raytheon's Knowledge of the Agreement Between Hidden Brook and Levasseur*

Hidden Brook must prove that Raytheon knew about its contract with Levasseur in order to sustain its claim of tortious interference with contract. *See Don King Prods.,* 742 F.Supp. at 775. That knowledge need not have been perfect or precise, *Gold Medal Farms, Inc. v. Rutland County Co-op. Creamery, Inc.,* 9 A.D.2d 473, 478–79, 10 A.D.2d 584, 195 N.Y.S.2d 179, 185 (3d Dep't 1960), nor must Raytheon have been aware of the legal particulars of the contract. *Don King Prods.,* 742 F.Supp. at 775; *Guard–Life,* 50 N.Y.2d at 189–90, 428 N.Y.S.2d 628, 406 N.E.2d 445 at 448 ("While it must be established ... that the alleged tortfeasor knew that his competitor had a contract with the third party, as a practical matter he will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract."). A large quantity of evidence tends to establish that Raytheon knew that Levasseur was obligated to buy Hidden Brook's plane.

First, evidence indicates that Raytheon knew about the deal even before Levasseur talked to Spencer about it. Spencer, a Raytheon sales director, sent a letter to Clermont Levasseur that stated, "Congratulations on your purchase of FL–165. I'm sorry you were not able to afford a new aircraft and wish you the best of luck." [Hidden Brook Decl. Ex. 32]

Raytheon claims that Levasseur told Spencer on June 20 that he had not yet signed a contract to purchase FL–165, and that he had until June 25 to decide whether to do so. The correspondence between Levasseur and Spencer after June 20, however, clearly communicated to Spencer that an agreement was in place. The June 21 letter Levasseur sent to Spencer, for example, stated that Levasseur would buy

FL–259 if Spencer would "find a firm buyer for FL 165 at $4,000,000 USD, and reimburse us the $200,000 deposit." [Hidden Brook Decl. Ex. 34] If there were no contract in place, Clermont Levasseur would not have needed a back-up buyer. The next letter that Levasseur sent to Spencer was even clearer. It proposed, as a condition of the Levasseur Defendants' purchase of FL–259, that Raytheon "honour[ ] the Super King Air 350, FL–165 *agreement* for $4,000,000 USD including $200,000 USD reimbursement (certified cheque) to 161768 Canada Inc." [Hidden Brook Decl. Ex. 35] (emphasis added).

Raytheon suggests that Spencer might have misunderstood Levasseur because English was not Levasseur's first language. But the written document is clear on its face. Raytheon's unsubstantiated speculation about a possible language barrier cannot undergird its motion for summary judgment. Indeed, an overwhelming amount of evidence suggests that Hidden Brook might be entitled to summary judgment on this point. However, the issue will be submitted to a jury.

### b. *The Defense of Economic Justification Does not Apply*

 Under the defense of economic justification, a party "with an economic stake in the business of another may interfere with a contract that the other business has with a third person" in order to further "its own economic interests." *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 63 (2d Cir.1988). "The imposition of liability in spite of a defense of economic interest requires a showing of either malice ... or fraudulent or illegal means." *WMW Mach. Co. v. Koerber AG*, 240 A.D.2d 400,

401, 658 N.Y.S.2d 385, 386 (2d Dep't 1997) (internal quotation marks and citations omitted). *see also MDC Corp. v. John H. Hartland Co.*, No. 01 Civ. 5918, 2002 WL 31175246, at *9 (S.D.N.Y. Oct. 1, 2002); *Foster v. Churchill*, 87 N.Y.S.2d 744, 642 N.Y.S.2d 583, 665 N.E.2d 153 (1996); *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 301 N.Y.S.2d 610, 249 N.E.2d 459 (1969).[16]

Raytheon admits that it did not have an economic stake in the Levasseur Defendants. Rather, Raytheon argues that it had an "equal or superior interest" to the contract rights with the Levasseur Defendants and could therefore "invade [those rights] with impunity." [Raytheon Reply 6] (quoting *Knapp v. Penfield*, 143 Misc. 132, 256 N.Y.S. 41 (1932)). Raytheon claims it had a superior interest in the contract rights with the Levasseur Defendants because (1) Hidden Brook only had a contract with Thabet (because he did not act within his authority as the Levasseur Defendants' agent), (2) the purchase agreement was void due to Thabet's secret commission, and (3) Raytheon had direct contact with 161768 Canada that began prior to that of Hidden Brook. The first argument is untenable as to Clermont Levasseur. The second argument is simply untenable, period. And the third is of no moment–Raytheon may have been the first to *contact* the Levasseur Defendants, but Hidden Brook went to *contract* first. The difference between "contact" and "contract" is one little "r"– but in that one letter is everything that goes with a *binding* agreement.

### III. CONCLUSION

For the reasons stated above, all parties' motions for summary judgment are de-

---

**16.** Massachusetts seems to recognizes a parallel defense under the rubric of "privilege." *See Charles River Data Sys., Inc. v. Oracle Complex Sys. Corp.*, 788 F.Supp. 54, 59–60 (D.Mass.1991); *Williams v. B & K Med. Sys., Inc.*, 732 N.E.2d 300, 308–09, 49 Mass.App. Ct. 563, 575–77 (Mass.App.Ct.2000).

nied. The parties are on forty-eight hours' notice to appear for trial on the issues that were not resolved on motion, unless they consent to have the matter heard and determined by a Magistrate Judge.

This is the decision and order of the Court